## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION, | Civil Action No._____ |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| DONGCHUL LEE, | **JURY TRIAL REQUESTED** |
| Defendant. | |

Plaintiff Boston Scientific Corporation ("Boston Scientific"), for its Complaint against Dongchul Lee ("Dr. Lee"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1. Boston Scientific hired Defendant Dongchul Lee in 2006 to work as a key member of its neuromodulation research team, which is charged with developing technologically-sophisticated neuromodulation devices, including spinal cord stimulation ("SCS") devices and peripheral nerve stimulation devices. These devices are used to treat patients suffering from chronic pain. While he worked for Boston Scientific, Dr. Lee used Boston Scientific's trade secrets, proprietary research, and other confidential information to research and develop innovative neuromodulation concepts, with the goal of improving Boston Scientific's SCS systems. Dr. Lee signed a contract in which he promised that, if he left Boston Scientific, he would not disclose Boston Scientific's sensitive—and commercially valuable—trade secrets to any other company. Dr. Lee has broken that promise. In October 2013 he resigned from Boston Scientific,

without telling Boston Scientific what job he intended to take next, but also stating that he planned to use the knowledge that he developed at Boston Scientific in his future employment.  Boston Scientific has just learned that Dr. Lee is working for a competitor, Nevro Corporation, which develops and sells SCS systems.  Dr. Lee is now using Boston Scientific's trade secrets—the very information that Boston Scientific gave him and paid him to develop—to help Boston Scientific's competitor, in disregard of his contractual obligations.  Boston Scientific brings this lawsuit to protect its trade secrets, to stop Dr. Lee from disclosing them, and to recover monetary damages for the harm that Dr. Lee's unlawful actions have caused.

## **PARTIES**

2. Boston Scientific is a Delaware corporation with its principal place of business in Natick, Massachusetts.

3. Boston Scientific is one of the world's largest manufacturers of medical devices.  Among other products, Boston Scientific develops, manufactures, distributes, and sells neuromodulation devices, which are used therapeutically to treat patients suffering from chronic pain.

4. Upon information and belief, defendant Dongchul Lee is a resident of California whose last known address is 11163 Lewis Hill Drive, Agua Dulce, CA, 91390.

## JURISDICTION AND VENUE

5.     Jurisdiction is proper under 28 U.S.C. Section 1332(a) because the matter in controversy exceeds $75,000 and is between citizens of different states.

6.     The Court has personal jurisdiction over Dr. Lee, and venue is proper in this District because Dr. Lee has consented to jurisdiction and venue in this District.

## FACTS

**The Neuromodulation Industry**

7.     This case involves the neuromodulation industry. Neuromodulation is the broad term for medical therapies that alter neural function. These therapies can be used in a variety of ways, but the most common is spinal cord stimulation which is used to treat chronic, debilitating pain.

8.     SCS delivers therapeutic doses of electrical current to the spinal cord for the management of pain. This is done by implanting a small, pulse-generating device in the patient and connecting the device to wires, called "leads," which are placed in strategic locations in the epidural space near the spinal cord. The electrical current that is generated and distributed can reduce, regulate, and, in some cases, eliminate chronic pain.

9.     Spinal cord stimulation and other neuromodulation therapies have dramatically improved patients' lives, and the market for neuromodulation devices and treatments is expanding rapidly. The market is also very competitive. Boston Scientific has devoted significant resources to studying neuromodulation therapies so that it can better understand how they work and, in turn, develop increasingly better treatments.

10. Scientists in the neuromodulation field are specifically studying the "mechanism of action" for SCS, i.e., precisely how it works. In studying the mechanism of action for SCS, scientists focus on three main factors that can influence the effectiveness of SCS therapy: (1) the location and manner in which the leads are placed; (2) the parameters within which the electrical stimulation is delivered to the patient; and (3) the sensation that patients feel when receiving the therapy. Each of these factors can be adjusted. Figuring out how each of these factors work—independently and in conjunction with each other—is helping scientists understand the mechanism of action for SCS therapy. This, in turn, helps researchers make SCS therapy more effective for patients. Gaining a complete understanding of how these factors work together to affect SCS therapy would be a significant development in the neuromodulation industry.

11. For example, many medical device companies and their scientists are studying how adjustments to the sensation that patients feel during SCS therapy influence the overall effectiveness of the treatment. One sensation that many patients feel during SCS therapy is a tingling feeling called "paresthesia." Most patients feel that the tingling sensation is useful, as evidence that the system is working. Other patients, however, prefer to minimize the tingling effect. Scientists studying this aspect of SCS have therefore been working on the ability to customize the sensation felt by patients during SCS therapy to their preference. At the same time, scientists have been studying the effect of sensation on the overall effectiveness of SCS therapy.

12. Many neuromodulation companies, including Boston Scientific and its competitors (including Medtronic, St. Jude Medical, and Nevro Corporation) are working

on various approaches to understand the mechanism of action for SCS therapy. Many different approaches are being explored to optimize this therapy for patients. For example, Nevro Corporation has researched and produced a product that uses a "high frequency" electrical current, instead of the more conventional frequency currents used by other companies. Another company, St. Jude, recently announced that it would test a different form of SCS called "burst stimulation."

13. Companies like Boston Scientific devote considerable resources to this research, and therefore guard the products of their research very carefully. Because the mechanism of action for SCS is influenced by several factors, each additional previously-unknown piece of information that a company can obtain brings that company closer to a breakthrough in SCS therapy.

**While At Boston Scientific, Dr. Lee Used And Developed Boston Scientific's Proprietary And Trade Secret Information**

14. Boston Scientific hired Dr. Lee in 2006 as a senior biomedical system engineer. In 2010, Dr. Lee was promoted to Principal Research Scientist.

15. Throughout Dr. Lee's tenure at Boston Scientific, the company invested significant resources in training him and supporting his development as a research scientist. This support included making introductions to leading physicians and scientists who conduct groundbreaking research in neuromodulation. Boston Scientific provided Dr. Lee with the extensive financial and technical support necessary to develop expertise in technical areas that were essential to his work.

16.     As part of Dr. Lee's work for Boston Scientific, the company gave him access to its confidential, proprietary, and trade secret information on a regular basis, and he used this information to develop and expand his knowledge of SCS technology.  Dr. Lee would not have been able to do this work, and obtain the research results that he did, without Boston Scientific's financial and technical support.  Dr. Lee used Boston Scientific's trade secrets in several technical areas.

17.     The first key area in which Dr. Lee obtained and worked with Boston Scientific's trade secrets and confidential information was in the company's study of the mechanism of action for SCS.  This included studying how making adjustments to certain factors can alter the overall effectiveness of SCS therapy.

18.     Boston Scientific asked Dr. Lee to lead a research effort that studied the sensations that patients feel during SCS therapy.  This research gave Dr. Lee important information about customizing SCS sensations to a patient's specific preferences.  Boston Scientific invested significant resources in Dr. Lee's project, and regarded it as one of the company's top priorities.

19.     This assignment gave Dr. Lee a unique understanding of how Boston Scientific developed relevant hypotheses, which hypotheses were pursued, how they were pursued, which hypotheses were abandoned, and the reasons why.  Boston Scientific also invested significant resources to fund collaboration on early-stage feasibility trials that were focused on understanding the mechanism of action for SCS.  In his role at Boston Scientific, Dr. Lee developed and contributed to these studies.  This research, funded by Boston Scientific, used and led to the creation of confidential, proprietary, and trade

secret information related to the study of SCS and its mechanism of action. For example, these studies uncovered, for the first time, the role of certain SCS parameters in delivering therapy.

20.     Boston Scientific has worked to protect this confidential, proprietary, and trade secret information by requiring its employees to treat the information with the strictest of confidentiality. Boston Scientific has also required outside researchers who worked with Dr. Lee to sign non-disclosure agreements regarding the contents and results of their collaboration with Boston Scientific and Dr. Lee.

21.     The confidential, proprietary, and trade secret information that Dr. Lee developed and used at Boston Scientific has significant commercial value. If this information is revealed to Boston Scientific's competitors, those other companies would obtain, practically for free, the benefit of Boston Scientific's years of research and the significant financial investment that Boston Scientific made in Dr. Lee's work. As a result, Boston Scientific's competitors could use that information to advance their own programs immediately, and without additional investment.

22.     The second area in which Dr. Lee was exposed to Boston Scientific's confidential, proprietary, and trade secret information relates to computer modeling of the human nervous system. Boston Scientific uses computer modeling as an essential tool in developing effective neuromodulation therapy. The more precise a model, the more effectively that a device using that model can deliver new SCS therapies. Innovative SCS therapies therefore demand highly sophisticated modeling of the nervous system. While at Boston Scientific, Dr. Lee developed extensive expertise in computer modeling,

7

using information that Boston Scientific provided him, and that he developed through Boston Scientific-funded clinical research that he performed. Through this work, Dr. Lee developed confidential and trade secret techniques and information that are the property of Boston Scientific, and that would be very valuable to Boston Scientific's competitors.

23. The third area in which Dr. Lee was exposed to Boston Scientific confidential, proprietary, and trade secret information relates to the development of unique algorithms used in programming SCS systems. Historically, SCS devices have required frequent adjustment to provide patients with effective therapy. These adjustments are typically done manually by a doctor or technician working with a patient on a trial-and-error basis. But Boston Scientific has developed sophisticated computer algorithms used in a programmable SCS system that simplifies adjustment and reduces the amount of time that physicians need to spend customizing the program for each patient. It also delivers specific therapy customized to the patient's unique needs, which improves the patient's therapy. As a Boston Scientific employee, Dr. Lee worked extensively on developing these algorithms and, in the process, Dr. Lee developed detailed knowledge regarding Boston Scientific's trade secrets. This information would be very valuable to Boston Scientific's competitors.

**Dr. Lee's Agreement With Boston Scientific**

24. As part of his employment with Boston Scientific, on October 21, 2009, Dr. Lee signed a Boston Scientific Corporation Agreement Concerning Employment for U.S. Employees (the "Agreement").

25. In Section 1 of the Agreement, Dr. Lee agreed that during his employment with Boston Scientific, he "may have access to or learn of confidential or proprietary information of Boston Scientific."

26. Section 3(a) of the Agreement provides that Boston Scientific developed or acquired Proprietary Information, which the Agreement defines as:

> information that is valuable to Boston Scientific and not generally known to its competitors or the public, including but not limited to materials and information (whether or not reduced to writing) relating to its operating procedures, products, methods, service techniques, designs, specifications, trade secrets, cost data, profits, markets and sales, customer lists, plans for present and future research, development and marketing. . . .

27. In Section 3(b) of the Agreement, Dr. Lee acknowledged that he would receive Proprietary Information during his employment with Boston Scientific, and that Boston Scientific "would not permit [Dr. Lee] to have access to Proprietary Information but for [his] promises in this Agreement." Dr. Lee further agreed "that the Proprietary Information is and will be the exclusive property of Boston Scientific."

28. In Section 3(c) of the Agreement, Dr. Lee agreed that he would not, during or after his employment with Boston Scientific, "disclose any Proprietary Information to any person other than personnel authorized by Boston Scientific." He further agreed not to use Boston Scientific's Proprietary Information "for personal benefit or for any purpose other than furthering the legitimate business interests of Boston Scientific."

29. In Section 3(d) of the Agreement, Dr. Lee agreed that if his employment with Boston Scientific terminated for any reason, he would "immediately deliver to Boston Scientific all property owned by Boston Scientific."

30.     Dr. Lee agreed, in Section 14 of the Agreement, that if he were to breach the Agreement, Boston Scientific would suffer "substantial and irrevocable damage," and would therefore be entitled to "specific performance and other injunctive relief."

31.     Dr. Lee also agreed that if he violates any of his obligations under the Agreement, he shall, in addition to any other remedies, pay Boston Scientific all reasonable attorney's fees and court costs that it incurs in enforcing its rights under the Agreement.

32.     Section 18 of the Agreement contains a choice-of-law provision, which provides that the Agreement "shall be interpreted and enforced as a Massachusetts contract and shall be interpreted and enforced in accordance with the internal laws of the Commonwealth of Massachusetts without regard to its conflict of law rules."

33.     Section 18 of the Agreement also contains a venue-selection and jurisdiction provision, which provides that "any action concerning the Agreement shall be commenced exclusively in the courts (including the Federal Courts) in either (i) the Commonwealth of Massachusetts or (ii) the state of the Employee's last . . . primary work location for Boston Scientific."

**Dr. Lee Quits Boston Scientific And Goes To Work For A Direct Competitor**

34.     On or about October 5, 2013, Dr. Lee announced that he was resigning from his position with Boston Scientific.  Despite being asked repeatedly whether he had accepted another job—and with what company—Dr. Lee would not provide Boston Scientific with any details.

10

35. At an exit interview on or about October 18, 2013, Boston Scientific asked Dr. Lee if, in his next job, he planned to continue working on the mechanism of action for SCS, an area he worked on at Boston Scientific. In response, Dr. Lee said something to the effect of, "What else would I do? That's what I know."

36. As part of his exit process, Dr. Lee participated in a separate exit interview with several senior employees of Boston Scientific that was devoted exclusively to his duties under the Agreement. During this meeting, Dr. Lee was reminded of the specific obligations of the Agreement regarding Proprietary Information. He was also told that he may not be able to accept certain jobs with other companies because those jobs would necessarily entail disclosure of the Proprietary Information that, in the Agreement, he promised to protect.

37. Dr. Lee was given a letter, dated October 18, 2013, from Lisa Welker-Finney, Boston Scientific Neuromodulation's Vice President for Human Resources, that again reminded him of his obligations under the Agreement. Ms. Welker-Finney, who participated in the meeting, told Dr. Lee that if, at any point in the future, he had questions about the scope of his obligations under the Agreement, he could feel free to contact her. Boston Scientific also offered to engage Dr. Lee as a consultant until he found alternative employment.

**Boston Scientific's Competitors Stand to Benefit Greatly from Dr. Lee's Knowledge of Boston Scientific's Trade Secrets**

38. Discovering the knowledge that Dr. Lee obtained in his SCS-related research would be an extremely valuable breakthrough for any company in the field of neuromodulation.

39. On information and belief, Boston Scientific's competitor, Nevro Corporation, is employing Dr. Lee or has retained him as a consultant. Nevro is a medical device company that specializes in SCS therapy. Nevro manufactures and markets an SCS system called "Senza®."

40. Nevro promotes Senza®'s alternative ability to deliver SCS therapy. The U.S. Food and Drug Administration ("FDA") has not approved Nevro's Senza® product for sale in the United States, though it has been approved in Europe and Australia. On information and belief, Nevro anticipates gaining FDA approval and releasing the Senza® system in the United States in 2014.

41. In addition to his knowledge about Boston Scientific's research regarding the mechanism of action for SCS, computer modeling of the nervous system, and the algorithms for programming SCS systems, Dr. Lee possesses a significant amount of competitively-sensitive knowledge of Boston Scientific's confidential scientific and technical plans to compete with Nevro's Senza® system in the United States.

42. The competitive information that Dr. Lee knows would be very valuable to Nevro (and to other companies against which Boston Scientific may compete on similar bases). The disclosure of this information would be profoundly damaging to Boston

Scientific's neuromodulation business, and would cause Boston Scientific irreparable harm.

**Dr. Lee's Work with Nevro Violates The Agreement And Massachusetts Law**

43.     On information and belief, before hiring Dr. Lee, Nevro did not possess the level of understanding that Boston Scientific possesses about the mechanism of action for SCS therapy, or the related areas of computer modeling of the nervous system and developing algorithms for programming SCS systems.

44.     Upon information and belief, Dr. Lee is currently providing services for Nevro in a capacity that requires him to assist in computer modeling of the human nervous system, developing algorithms for use in programming neuromodulation systems, and/or identifying the mechanism of action for SCS therapy.

45.     In performing his duties at Boston Scientific, Dr. Lee was exposed to or himself developed Boston Scientific's proprietary and confidential information on these topics.  Because Nevro lacks independent knowledge of the proprietary and trade secret information to which Dr. Lee was exposed or that he developed while employed by Boston Scientific, his work for Nevro in this capacity necessarily involves the misuse, and improper disclosure, of that information.

46.     By engaging Dr. Lee's services in these capacities, Nevro has obtained and will continue to obtain the benefits of the Boston Scientific's proprietary and trade secret information.

47.     As a result, Dr. Lee has improperly disclosed Boston Scientific's confidential and proprietary trade secrets.

13

## COUNT ONE
## Breach of Contract

48. Boston Scientific restates and realleges all previous paragraphs.

49. Dr. Lee's work with Nevro necessarily entails his disclosure of Proprietary Information (as that term is defined in Dr. Lee's Agreement with Boston Scientific) to persons not authorized by Boston Scientific, and also necessarily entails use of Proprietary Information for purposes other than furthering the legitimate business interests of Boston Scientific.

50. Dr. Lee therefore breached his Agreement.

51. Boston Scientific has been irreparably harmed by this breach.

52. Boston Scientific has also been damaged in an amount exceeding $75,000.00 to be determined at trial.

## COUNT TWO
## Violation of Massachusetts Trade Secret Protection Act

53. Boston Scientific restates and realleges all previous paragraphs.

54. Boston Scientific's confidential and proprietary information regarding computer modeling of the human nervous system, algorithms for use in programming neuromodulation systems, and the mechanism of action for SCS and related research constitute trade secrets as defined by Mass. Gen. Laws ch. 266, section 30.

55. Dr. Lee has unlawfully obtained Boston Scientific's trade secrets with the intent to convert the trade secrets to his own use, in violation of the terms of the written employment agreement between Boston Scientific and Dr. Lee, and in violation of Mass. Gen. Laws ch. 93, section 42.

56. By virtue of this violation, Boston Scientific is entitled to a preliminary injunction under Mass. Gen Laws ch. 93, 42A.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff Boston Scientific Corporation respectfully asks the Court to:

1. Enter judgment against Dongchul Lee for all damages proximately caused by his wrongful actions and costs available under the law.

2. Enter judgment against Dongchul Lee, requiring him to pay Boston Scientific's costs and attorneys' fees in enforcing Boston Scientific's rights under the employment agreements at issue in this action.

3. Issue an injunction preventing Dongchul Lee from performing work for any other company in any capacity related to computer modeling of the human nervous system to the extent that such work discloses Boston Scientific's Proprietary Information, developing algorithms for use in programming neuromodulation systems, or discovering the mechanism of action for SCS.

4. Issue an order that the above-requested relief be binding upon Dongchul Lee and his affiliates, successors and assigns, agents, servants, employers, employees, representatives, attorneys, and persons in active concert or participation with any of them.

5. Order all other relief that the Court deems proper and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues in this action.

Dated: December 13, 2013

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr. (BBO# 659322)
One Boston Place Suite 3220
Boston, MA 02108
617-994-5728
patrick.curran@ogletreedeakins.com

Of counsel:

FAEGRE BAKER DANIELS LLP

Robert L. Schnell, Jr.
*robert.schnell@faegrebd.com*
Martin S. Chester
*martin.chester@faegrebd.com*
Eileen M. Hunter
*eileen.hunter@faegrebd.com*
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000

*Attorneys for Plaintiff Boston Scientific Corporation*

16661381.1