UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOSTON SCIENTIFIC CORPORATION,

Plaintiff,

vs.

DONGCHUL LEE,

Defendant.

Civil No.  1:13-cv-13156-DJC

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR EXPEDITED DISCOVERY**

Dongchul Lee is a scientist who led a Boston Scientific research team focused on developing breakthroughs in neuromodulation therapy, which is used to treat patients with chronic pain.  In the course of Dr. Lee's work for Boston Scientific, the company entrusted him with commercially valuable trade secrets and other proprietary information, including information about how Boston Scientific planned to use his research (and other information) to compete against rival companies.  Dr. Lee signed an agreement in which he promised not to use or disclose this information.

In October 2013, Dr. Lee unexpectedly gave notice of his intent to quit his position as a Principal Research Scientist at Boston Scientific, and did quit the company later that month.  He would not answer questions about where he planned to work next. He conceded during an exit interview, however, that he planned to continue working in the very areas in which he worked while employed by Boston Scientific.  Boston Scientific has since learned that Dr. Lee has accepted a job with Nevro Corporation, a neuromodulation company that competes directly with Boston Scientific.  It has also learned that Dr. Lee is pursuing research for Nevro regarding the "mechanism of action"

for neuromodulation devices—the exact thing he did for Boston Scientific. Nevro is now in a position to benefit significantly—and improperly—from Dr. Lee's knowledge of confidential and proprietary information that Boston Scientific spent years and millions of dollars to discover.

Boston Scientific filed a Complaint against Dr. Lee on December 13, 2013, alleging that Dr. Lee has breached his agreement with Boston Scientific and violated trade secret laws by going to work for Nevro. Boston Scientific now respectfully asks the Court to permit Boston Scientific to conduct immediate, limited discovery to determine the capacity and scope of Dr. Lee's employment at Nevro, and the extent to which he has shared Boston Scientific's trade secrets and confidential information with Nevro, so it can develop additional facts to further support its motion for preliminary injunction, which is being filed concurrently with this motion. This discovery is necessary to buttress the evidence that Dr. Lee is causing irreparable harm by working for Nevro, and that injunctive relief is necessary and appropriate to remedy that harm.

## BACKGROUND

### The Neuromodulation Industry

"Neuromodulation" is a type of medical therapy that alters neural function. (Decl. of Rafael Carbunaru ¶ 2.) This case deals with the most common application of neuromodulation, which treats chronic, debilitating pain. (*Id.*) One form of this treatment is called spinal cord stimulation ("SCS"), which involves implanting a small device in the patient that generates electrical current. (*Id.*) Another form of neuromodulation is peripheral nerve stimulation, which involves stimulating nerve areas

other than the spine. *Id.* In SCS, the pulse-generating device is connected to strategic locations near the patient's spinal cord using long, thin wires called "leads." ( *Id. ¶* 3.) The device and leads deliver an electrical current to the nerves along the spinal cord, which can reduce, regulate, and, in some cases, eliminate chronic pain. (*Id.*)

The market for SCS devices that treat pain is growing fast, and the industry is very competitive. (*Id. ¶* 4. ) Because of this, medical device companies like Boston Scientific devote millions of dollars, and significant time by their scientists and other employees, to researching technology that will improve treatment for patients. (*Id.*) All of this research results in proprietary information and trade secrets that are profoundly valuable to Boston Scientific's business. (*Id. ¶* 15.) Boston Scientific therefore guards its proprietary and trade secret information very carefully. (*Id.*)

**Dr. Lee's Role in Boston Scientific's Most Important Neuromodulation Research**

A significant amount of neuromodulation research is focused on gaining a more complete understanding of exactly how SCS reduces and eliminates pain. (*Id. ¶* 5.) Understanding more about the precise way that SCS works (called the "mechanism of action") will be a crucial discovery in the field of neuromodulation, and will lead to even better treatments for chronic, debilitating pain. (*Id.*) Boston Scientific has invested years of employee time and millions of dollars in product development and trials to identify and customize the mechanism of action for SCS. (*Id. ¶¶* 13-15.)

Dr. Lee has been at the center of Boston Scientific's research on this subject. (*Id.*) His research at Boston Scientific included three main components: (1) studying the

mechanism of action for SCS; (2) modeling the human nervous system; and (3) developing algorithms to program SCS systems. (*Id.* ¶¶ 12-17.)

**Mechanism of Action Research.** One of the subjects of Dr. Lee's research for Boston Scientific involved the mechanism of action for SCS and the sensations that patients feel during SCS therapy. (*Id.* ¶ 12-13.) Many medical device companies and their scientists are studying how adjusting the sensation that patients feel during SCS therapy influences the overall effectiveness of the treatment. (*Id.* ¶ 6.) For example, most patients find the tingling sensation that accompanies SCS therapy—called "paresthesia"— to be useful, as evidence that the system is working, while other patients prefer to minimize this tingling effect. (*Id.*) Scientists studying this aspect of SCS have been working on the ability to customize the sensation felt by patients during SCS therapy to their preference, while also studying how this customization influences the effectiveness of this therapy. (*Id.*)

Boston Scientific's competitors, including Medtronic, St. Jude Medical, and Nevro, are also working to understand the mechanism of action for SCS. (*Id.* ¶ 7.) For example, Nevro touts the fact that its Senza® system uses a high frequency electrical current instead of the conventional, lower frequency currents used by other companies. (Decl. of Eileen Hunter Ex. A.)  St. Jude also recently announced that it will test a form of SCS called "burst stimulation," which it claims can deliver therapy without paresthesia. (*See* Hunter Decl. Ex. B.)  Understanding the mechanism of action will allow any neuromodulation company not only to customize the sensations that patients

experience during SCS therapy, but also to improve the performance of those therapies. (Carbunaru Decl. ¶ 6.)

Boston Scientific has invested significant resources in researching the mechanism of action for SCS. (*Id.* ¶¶ 8, 12-15.) Boston Scientific asked Dr. Lee to lead a research effort that studied the sensations that patients feel during SCS therapy. (*Id.* ¶ 13.) This research gave Dr. Lee important information about customizing SCS sensations to patients' specific preferences. (*Id.*) Boston Scientific invested significant resources in Dr. Lee's project, and regarded it as one of the company's top priorities. (*Id.*) This assignment gave Dr. Lee a unique understanding of how Boston Scientific developed relevant hypotheses, which hypotheses were pursued, how they were pursued, which hypotheses were abandoned, and the reasons why. (*Id.*) Boston Scientific also invested significant resources to fund collaboration on early-stage feasibility trials that were focused on understanding the mechanism of action for SCS. (*Id.*) In his role at Boston Scientific, Dr. Lee developed and contributed to these studies. (*Id.*) This research, funded by Boston Scientific, led to the creation of confidential, proprietary, and trade secret information related to the study of SCS and its mechanism of action. (*Id.*) For example, these studies uncovered, for the first time, the role of certain SCS parameters in delivering therapy. (*Id.*)

Dr. Lee could not have learned this information without the financial and technical support that Boston Scientific invested in the project he led. (*Id.* ¶ 11.) The information he developed is invaluable to Boston Scientific, and the company therefore holds the information related to these studies in the strictest confidence. (*Id.* ¶ 15.) In addition to

requiring non-disclosure agreements from its employees—like Dr. Lee—Boston Scientific required outside researchers who worked with Dr. Lee to sign agreements promising that they would not disclose the contents or results of their collaboration with Boston Scientific or Dr. Lee.  (*Id.*)

Because Dr. Lee knew so much about Boston Scientific's research into the mechanism of action for SCS, the company provided him with detailed information on how Boston Scientific would compete against other companies' technologies in the marketplace.  (*Id.* ¶ 30.)  One of those technologies, a device called Senza®, is manufactured by Nevro, and is anticipated to be approved for sale in the U.S. in 2014.  (*Id.* ¶¶ 28-29.)

**Human Nervous System Modeling.**  Computer modeling of the human nervous system is an essential tool in developing effective neuromodulation therapy.  (*Id.* ¶ 16.)  The more precise a model, the more effectively a device using that model can deliver new SCS therapies.  *Id.*  Innovative SCS therapies therefore demand highly sophisticated modeling of the nervous system.  *Id.*  While at Boston Scientific, Dr. Lee developed extensive expertise in computer modeling, using information that Boston Scientific provided him, and creating confidential and trade secret techniques and information that are the property of Boston Scientific.  *Id.*

**Proprietary Algorithms for Programming SCS Systems.**  Another part of Dr. Lee's job at Boston Scientific was to develop unique algorithms that are used to program SCS systems.  (*Id.* ¶ 17.)  These sophisticated algorithms represent a significant advance in SCS therapy.  (*Id.*)  SCS devices require frequent adjustment to provide patients with

effective therapy. (*Id.*) Until recently, these adjustments were done manually by a doctor or technician working with a patient on a trial-and-error basis, adjusting the manner in which electrical current is delivered and asking the patient how it feels. (*Id.*) By employing scientists like Dr. Lee, Boston Scientific has developed sophisticated computer algorithms that, when used in software programmed in an SCS system, make many of these adjustments automatically. (*Id.*) This simplifies the process for both patients and doctors by making the adjustment process faster and more effective. (*Id.*) This system also delivers specific therapy customized to the patient's unique needs, which improves the patient's therapy. (*Id.*) Dr. Lee worked extensively on developing these algorithms and, in the process, Dr. Lee developed detailed knowledge of Boston Scientific's trade secrets on this subject. (*Id.*)

**Dr. Lee's Agreement Not To Use Or Disclose Boston Scientific's Proprietary Information**

As part of his employment with Boston Scientific, on October 21, 2009 Dr. Lee signed a Boston Scientific Agreement Concerning Employment for U.S. Employees ("Agreement"). (*Id.* ¶ 18; Carbunaru Decl. Ex. A.) The Agreement's protections for Boston Scientific's Proprietary Information apply to Dr. Lee even though he no longer works for Boston Scientific. (Carbunaru Decl. Ex. A. at § 3.)

In signing that Agreement, Dr. Lee agreed that Boston Scientific would provide him with trade secrets and other proprietary and confidential information, referred to collectively in the Agreement and below as "Proprietary Information," that is not generally known to competitors and the public. (*See Id.* §§ 1, 3(a).) Dr. Lee acknowledged that working in his sensitive position at Boston Scientific created "a

7

relationship of confidence and trust between [him] and Boston Scientific" regarding the Proprietary Information. (*Id.* § 3(b).) Dr. Lee agreed that the Proprietary Information "is and will be the exclusive property of Boston Scientific." (*Id.*)

Dr. Lee promised that he would not, without express permission from Boston Scientific, "disclose any Proprietary Information to any person other than personnel authorized by Boston Scientific." (*Id.* § 3(c).) He also agreed that he would not use any of the Proprietary Information "for personal benefit or for any purpose other than furthering the legitimate business interests of Boston Scientific." (*Id.*)

Dr. Lee also acknowledged that Boston Scientific would not have allowed him to have access to any of the Proprietary Information without his promises in the Agreement to protect and preserve the confidentiality of that information. (*Id.* § 3(b).)

Finally, Dr. Lee agreed that upon leaving Boston Scientific, he would return all Proprietary Information to the company. (*Id.* § 3(d).)

**Dr. Lee's Resignation From Boston Scientific To Do The Same Work For A Competitor**

On October 5, 2013, Dr. Lee announced that he was quitting Boston Scientific. (Carbunaru Decl. ¶ 19.) Because Dr. Lee and his research were so important to Boston Scientific's business, the company tried hard to change his mind and convince him to stay, offering to promote Dr. Lee to Fellow, Research Scientist, a position that would have allowed Dr. Lee to direct his own research budget. Boston Scientific also offered Dr. Lee leadership and customer innovation training, individual executive coaching, and an increased yearly salary. (*Id.* ¶ 20.) Dr. Lee refused these offers. (*Id.*) He also would

8

not tell his co-workers—or anyone at Boston Scientific—where he was going to work. (*Id.* ¶ 19.)

On October 18, 2013, Dr. Lee participated in exit interviews with Boston Scientific. (*Id.* ¶ 21.) During the interviews, Dr. Lee was asked if, in his next job, he planned to continue working on the mechanism of action for SCS, an area he worked on at Boston Scientific. (*Id.*) In response, Dr. Lee said something to the effect of, "What else would I do? That's what I know." (*Id.*) Boston Scientific reminded Dr. Lee of his obligations to protect Proprietary Information during his exit interviews, and provided him with a letter summarizing and explaining those obligations. (*Id.* ¶¶ 22, 23; Carbunaru Decl. Ex B.) Boston Scientific also offered to engage Dr. Lee as a consultant until he found alternative employment, an offer that Dr. Lee declined. (*Id.* ¶ 24.)

Dr. Lee now works for Nevro, a medical device company that manufactures and markets an SCS system called "Senza®." (*Id.* ¶¶ 26, 27, 28 & Ex. C.) Nevro's Senza® system is not approved by the Food and Drug Administration for sale in the United States, although Senza® has been approved in Europe and Australia. (*Id.* ¶ 29.) Boston Scientific believes Nevro is expecting to receive approval to sell the Senza® system in the United States in 2014. (*Id.*) In addition, Dr. Lee is scheduled to represent Nevro on the faculty for an upcoming neuromodulation industry conference called "Mechanisms of Action: Electrical Stimulation of the Nervous System." (*Id.* ¶ 29; Ex. C.) This conference will address what is known and not known today regarding mechanisms of action of electrical stimulation of targets including the spinal cord and the peripheral

nervous system.  (*Id.*)   Before he left Boston Scientific, Dr. Lee was scheduled to represent Boston Scientific at this conference.  (*Id.*)

**Dr. Lee's Work At Nevro And How It Necessarily Discloses Boston Scientific's Proprietary Information**

Before hiring Dr. Lee, Nevro did not possess the results of Boston Scientific's research into the mechanism of action for SCS, Boston Scientific's approach to computer modeling of the nervous system, or Boston Scientific's algorithms and related research for programming SCS systems.  (*Id.* ¶ 32.)  By hiring Dr. Lee—who conceded in his exit interview that his new job will involve the same work he did at Boston Scientific—Nevro is poised to improperly obtain Boston Scientific's Proprietary Information, which Boston Scientific paid Dr. Lee to develop, and which he promised to protect.  (*Id.* ¶¶ 8, 25, 31.)

In addition to Dr. Lee's knowledge of Boston Scientific's research regarding the mechanism of action for SCS, Dr. Lee possesses a significant amount of competitively-sensitive knowledge of Boston Scientific's confidential scientific and technical plans to compete with the Senza® system if and when it gains FDA approval.  (*Id.* ¶ 30.)  The information that Dr. Lee knows about Boston Scientific's confidential plans to compete with Nevro's Senza® system would be very valuable to Nevro, and its disclosure to Nevro would cause irreparable harm to Boston Scientific.  (*Id.*)

Based on Dr. Lee's statement that he planned to continue working in the area in which he worked for Boston Scientific, Boston Scientific believes that Dr. Lee is using and disclosing Boston Scientific's Proprietary Information in his new job with Nevro. Indeed, it would be impossible for him *not* to do so.  Dr. Lee knows Boston Scientific's

10

Proprietary Information, including its plans for competing against Nevro. He cannot "unknow" this information and work for Nevro.

## ANALYSIS

### I.     Legal Standard

This Court has the discretion to order discovery on an expedited basis. *See* Fed. R. Civ. P. 26(d); *see also* Fed. R. Civ. P. 33(a), 34(b). For a party to obtain expedited discovery in the District of Massachusetts, it must show good cause. *West Coast Prods., Inc. v. Does*, No. 12-30087-MAP, 2013 WL 1092163 at *6 (D. Mass. Feb. 15, 2013). While "[t]he First Circuit has not addressed the proper standard for determining whether good cause exists for expedited discovery," the District of Massachusetts has applied a reasonableness standard in assessing good cause. *Id.* In *Momenta Pharmaceuticals, Inc. v. Teva Pharmaceuticals Industries, Ltd.*, the Court analyzed a request for expedited discovery based on the "reasonableness of the request in light of all the surrounding circumstances." 765 F. Supp. 2d 87, 89 (D. Mass. 2011). To determine whether the requested discovery is reasonable, the Court should consider factors such as "the purpose for the discovery, the ability of the discovery to preclude demonstrated irreparable harm, the plaintiff's likelihood of success on the merits, the burden of discovery on the defendant, and the degree of prematurity." *Id.* (quoting *McMann*, *McMann v. Doe*, 460 F. Supp. 2d 259, 265 (D. Mass. 2006)).

## II. There Is Good Cause To Expedite Discovery

### A. The purpose of the discovery is to reveal Dr. Lee's job duties at Nevro.

Boston Scientific knows this much:

- Dr. Lee knows sensitive, proprietary information that is commercially and scientifically valuable to Boston Scientific, which he obtained and developed only by working at Boston Scientific. Among other things, Dr. Lee knows Boston Scientific's plans for competing with a Nevro device that Nevro hopes to sell in the U.S.

- Dr. Lee told Boston Scientific that in his new job, he would be working on the same subjects that he worked on for Boston Scientific.

- Dr. Lee now works for Nevro, a competitor that stands to benefit greatly from learning the technical and competitive information that he developed and acquired at Boston Scientific.

- Dr. Lee is, at a minimum, working for Nevro on the mechanism of action for SCS, an area in which he specifically worked for Boston Scientific.

These facts are troubling, and lead Boston Scientific to conclude that Dr. Lee is disclosing its Proprietary Information and causing Boston Scientific irreparable harm—which is grounds for a preliminary injunction. But to fully prosecute Boston Scientific's motion for preliminary injunction, Boston Scientific needs more information. Everything that Boston Scientific knows about Nevro and its business suggests that Dr. Lee's employment necessarily is causing him to breach his Agreement and is causing Boston Scientific irreparable harm. But Dr. Lee has refused to tell Boston Scientific about his employment with Nevro or his specific duties. Boston Scientific therefore needs limited, expedited discovery to obtain this information. If Boston Scientific was forced to wait for discovery to commence in the ordinary course—i.e., after the parties have held the

conference required by Rule 26(f)—it would be too late to stop Dr. Lee from causing harm to Boston Scientific that no relief afforded by the Court could ever truly repair.

So that Boston Scientific may seek appropriate preliminary injunctive relief, Boston Scientific asks the Court to order Dr. Lee to respond to the following discovery on an expedited basis:

1. Plaintiff's First Set of Requests for Production of Documents to Defendant, attached to the Declaration of Eileen Hunter as Exhibit C;

2. A deposition of Dr. Lee regarding:

    a. the nature and scope of his employment at Nevro, including but not limited to the subject area of his work, and the types of devices he is working to develop or invent;

    b. Nevro's recruitment of him and/or the process of him becoming affiliated with Nevro; and

    c. his use, retention, or disclosure of Boston Scientific's Proprietary Information.

This proposed discovery is narrowly tailored to permit Boston Scientific to determine whether, and to what extent, Dr. Lee's employment at Nevro threatens the confidentiality of Boston Scientific's Proprietary Information. The requests are designed solely to allow Boston Scientific to determine what Dr. Lee is doing at Nevro, what Proprietary Information he has provided to Nevro, and the degree to which his job at Nevro inevitably requires the disclosure of Boston Scientific's Proprietary Information.

## B. Boston Scientific needs this information to prevent irreparable harm.

Dr. Lee cannot separate his knowledge of Boston Scientific's Proprietary Information from his own thoughts and ideas if he works to develop neuromodulation products for Nevro, Boston Scientific's competitor. The harm that Boston Scientific will suffer if Dr. Lee relies on, and therefore discloses, this information in his work for Nevro, will be irreparable. (*See* Carbunaru Decl. ¶ 32.)

Courts in the District of Massachusetts have recognized that an employer suffers irreparable harm when a former employee will inevitably disclose the employer's trade secrets. *See Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297-98 (D. Mass. 1995); *Lombard Med. Techs. Inc. v. Johannessen*, 729 F. Supp. 2d 432, 435 (D. Mass. 2010); *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 121 (D. Mass. 2011). In this case, as in similar cases considered by this District, it is "difficult to conceive how all of the information stored in [Dr. Lee's] memory can be set aside as he applies himself to a competitor's business and its products." *Marcam*, 885 F. Supp. at 297. The truth is that Dr. Lee cannot segregate his knowledge of Boston Scientific's trade secrets from his thoughts and ideas about the mechanism of action for SCS devices and related topics on which he worked for Boston Scientific. He will inevitably disclose this Proprietary Information to Nevro, and that causes Boston Scientific irreparable harm.[1]

The Proprietary Information that Dr. Lee possesses has been painstakingly developed by Boston Scientific over years of research and clinical evaluations. Once the information is revealed to a competitor, the damage will be irreversible. Nevro will not

---

[1] Boston Scientific discusses in more detail the irreparable harm that it will suffer at pages 11-12 of the memorandum supporting its Motion for Preliminary Injunction.

be able to return the intangible knowledge it gains from Dr. Lee, nor will any of Nevro's employees be able to "unlearn" the insights that they receive from Dr. Lee. Thus, Boston Scientific has an urgent need to discover the exact parameters of Dr. Lee's employment at Nevro and to learn about his disclosure of Proprietary Information.[2]

**C. Dr. Lee will not be burdened by responding to the limited requests.**

Boston Scientific is seeking very specific information to which Dr. Lee has ready access. It will take very little time for him to explain his job duties at Nevro and to collect the relevant related documents, and Boston Scientific will conduct his deposition in seven hours or less at a location convenient to him. Any minor inconvenience that responding to these limited discovery requests may cause Dr. Lee are minimal, and insignificant when compared to the irreparable harm Boston Scientific will continue to suffer as a result of Dr. Lee's conduct.

**D. The discovery is not premature.**

Boston Scientific has an urgent need for precise information about the nature of Dr. Lee's employment with Nevro and the extent to which he is disclosing Proprietary Information to Nevro. Concurrently with this Motion for Expedited Discovery, Boston Scientific has filed a Motion for Preliminary Injunction. When a motion for preliminary injunction is pending, a request for expedited discovery is not premature. *Cf. Momenta Pharms.*, 765 F. Supp. 2d at 89. Accordingly, and because the information sought is

---

[2] Boston Scientific is also likely to prevail on the merits of this claim. Boston Scientific's likelihood of success on the merits is discussed in the concurrent motion for preliminary injunction.

needed to prevent immediate and irreparable harm, Boston Scientific's request for expedited discovery is not premature, and should be granted.

## CONCLUSION

Boston Scientific respectfully asks the Court to order Dr. Lee to respond to limited, expedited discovery to confirm the nature and extent of Dr. Lee's duties at Nevro.

Dated:  December 20, 2013          OGLETREE DEAKINS NASH, SMOAK & STEWART, P.C.,

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr. (BBO #695322)
One Boston Place Suite 3220
Boston, MA 02108
617-994-5728
*patrick.curran@ogletreedeakins.com*

Of Counsel:

FAEGRE BAKER DANIELS LLP

Robert L. Schnell, Jr., (pro hac vice pending)
*robert.schnell@faegreBD.com*
Eileen M. Hunter, (pro hac vice pending)
*eileen.hunter@faegreBD.com*
Martin S. Chester (pro hac vice pending)
*martin.chester@faegreBD.com*
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000

A*ttorneys for Plaintiff Boston Scientific Corporation*

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Dongchul Lee by U.S. mail on December 20, 2013.

                /s/ Patrick M. Curran, Jr.
                Patrick M. Curran, Jr.

16716172.1