**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION, | Civil No. 1:13-cv-13156-DJC |
| Plaintiff, | |
| vs. | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| DONGCHUL LEE, | |
| Defendant. | |

Dongchul Lee began working for Boston Scientific in 2006 and was a lead research scientist focused on developing breakthroughs in neuromodulation therapy, which is used to treat patients with chronic pain. While Dr. Lee worked for Boston Scientific, the company entrusted him with commercially valuable trade secrets and other proprietary information. Dr. Lee signed a contract with Boston Scientific, promising not to use or disclose this information. He has now broken that promise by going to work for a direct competitor, Nevro Corporation, in the very same area of cutting-edge research in which he worked for Boston Scientific.

In October 2013, Dr. Lee resigned from Boston Scientific, and would not say where he planned to work next. He conceded during an exit interview, however, that he planned to continue working in the very areas in which he worked while employed by Boston Scientific. Dr. Lee has since begun working for Nevro Corporation, a neuromodulation company that directly competes with Boston Scientific. By doing the same research work for Nevro that he did for Boston Scientific, Dr. Lee is disclosing the trade secrets and other information that he agreed he would keep secret. This breaches

his contract, violates Massachusetts law, and is causing Boston Scientific irreparable harm.

Boston Scientific filed a Complaint against Dr. Lee on December 13, 2013 (Dkt. No. 1)[1] and now respectfully asks the Court for a preliminary injunction to prevent Dr. Lee from violating his Agreement in his work for Nevro.

## BACKGROUND

Boston Scientific has fully discussed the background for this motion in its memorandum supporting its Motion for Expedited Discovery, (Dkt. No. 6), which has been filed concurrently with this motion. To avoid duplication, Boston Scientific respectfully refers the Court to that memorandum. (*See* Docket No. 7 at 2-11.)

## DISCUSSION

### I.  Legal Standard

To receive a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure, Boston Scientific must show: (1) a likelihood of success on the merits of its claims; (2) that it will suffer irreparable harm without the requested injunctive relief; (3) a favorable balance of hardships; and (4) "a fit (or, at least, a lack of friction) between the injunction and the public interest." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).

---

[1] Boston Scientific has been attempting to serve process on Dr. Lee personally at his residence and at the offices of his new employer without success. On December 20, 2013, Boston Scientific effected substitute service of process on Dr. Lee by leaving a copy of the Summons and Complaint with a manager at the offices of his new employer, and sending another copy to him by U.S. first class mail. *See* Fed. R. Civ. P. 4; Cal. Code Civ. P. § 415.20(b).

## II. Boston Scientific Is Likely To Succeed On the Merits Of Its Claims

### A. Boston Scientific is likely to prove that Dr. Lee has breached his contract with Boston Scientific.

#### 1. Dr. Lee signed a contract, agreeing to keep Boston Scientific information confidential.

As part of his employment with Boston Scientific, Dr. Lee signed a Boston Scientific Agreement Concerning Employment for U.S. Employees. (Carbunaru Decl. Ex. A (the "Agreement").) The Agreement contained non-disclosure provisions that apply to Dr. Lee after his employment with Boston Scientific ended. (*Id* § 3.)

In signing that Agreement, Dr. Lee agreed that Boston Scientific would provide him with trade secrets and other proprietary and confidential information that is not generally known to competitors and the public, referred to collectively in the Agreement as "Proprietary Information." (*See id.* §§ 1, 3(a).) Dr. Lee acknowledged that working in his sensitive position at Boston Scientific created "a relationship of confidence and trust between [him] and Boston Scientific" regarding the Proprietary Information. (*Id.* § 3(b).) He agreed that the Proprietary Information "is and will be the exclusive property of Boston Scientific." (*Id.*)

Dr. Lee promised that he would not, without express permission from Boston Scientific, "disclose any Proprietary Information to any person other than personnel authorized by Boston Scientific." (*Id.* § 3(c).) He also agreed that he would not use any of the Proprietary Information "for personal benefit or for any purpose other than furthering the legitimate business interests of Boston Scientific." (*Id.*)

Dr. Lee also acknowledged that Boston Scientific would not have allowed him to have access to any of the Proprietary Information without his promises in the Agreement

3

to protect and preserve the confidentiality of that information.  (*Id.* § 3(b).)  The Agreement provides that it will be interpreted and enforced under Massachusetts law.  (*Id.* § 18.)

### 2. Dr. Lee is breaching his agreement in his new work for Nevro.

Boston Scientific and Nevro compete against each other in the rapidly-evolving, highly-competitive neuromodulation industry.  (*See* Declaration of Rafael Carbunaru ¶¶ 4, 7.)  Both companies manufacture and sell sophisticated medical devices to deliver spinal cord stimulation ("SCS") therapy, which treats patients with chronic, debilitating pain.  (*Id.* ¶¶ 2, 7, 28-31.)  Dr. Lee was at the center of Boston Scientific's research related to improving SCS devices and therapies.  (*Id.* ¶¶ 11-15.)

One of the most important areas that neuromodulation companies are studying is the "mechanism of action" for SCS therapy—i.e., how SCS therapy works.  (*Id.* ¶¶ 5, 27.)  By improving the understanding of the SCS mechanism of action, companies can develop products that customize the sensations that patients experience during SCS therapy and improve the performance of those therapies.  (*Id.* ¶¶ 6, 7.)  Companies closely guard research in this area.  (*Id.* ¶¶ 5, 8.)

Since 2011, two of Dr. Lee's primary roles in his work for Boston Scientific were researching the SCS mechanism of action and conducting related early-stage feasibility trials.  (*Id.* ¶¶ 12-14.)  Dr. Lee's work and research in these two areas were top priorities for Boston Scientific.  (*Id.* ¶¶ 8, 12-15, 25.)  The company devoted significant resources to them and Boston Scientific holds the information related to them in the strictest confidence.  (*Id.*)  Dr. Lee's study of the SCS mechanism of action and the related

feasibility trials he conducted—using Boston Scientific funds—led to the creation of highly-valuable confidential, proprietary, and trade secret information, including the unique discovery of the role of certain SCS parameters in delivering therapy. (*Id.* ¶¶ 14, 15.) It also allowed Dr. Lee to acquire a unique understanding of which scientific inquiries and feasibility trials regarding the SCS mechanism of action were fruitful, and which were not—knowledge that would have significant value to a competitor if revealed.[2] (*Id.* ¶ 25.)

Under the terms of his Agreement, Dr. Lee knew that the information he was learning, using, and developing about the SCS mechanism of action and the related feasibility trials was Boston Scientific's proprietary information. (Carbunaru Decl. Ex. A §§ 1, 3.) He could not have learned this information without the financial and technical support that Boston Scientific invested in the projects he led, (*id.* ¶ 11), and he could not have obtained the position he held at Boston Scientific without agreeing that such information was Boston Scientific's property (*id*. Ex. A Preamble, §§ 1, 3).

When Dr. Lee left Boston Scientific, he said in his exit interview that he intended to continue working in these areas in his next job—and declined to answer Boston Scientific's questions about where his next job would be. (*Id.* ¶¶ 19, 21.) Boston Scientific expressly told Dr. Lee that he may not be able to accept certain jobs because they would necessarily entail the disclosure of Boston Scientific's Proprietary Information. (*Id.* ¶ 22.)

---

[2] Dr. Lee was also exposed to Boston Scientific's Proprietary Information in other areas, including modeling the human nervous system, developing algorithms used in programming SCS systems, peripheral nerve stimulation, and understanding Boston Scientific's plans to compete against Nevro Corporation. (*See* Dkt. No. 1 ¶¶ 22-23, 41.)

Boston Scientific has since discovered that Dr. Lee is working for Nevro, a direct competitor[3], and that he is continuing—for Nevro—the same research regarding the SCS mechanism of action that spent the last several years developing for Boston Scientific. (*Id.* ¶¶ 26-27.) Dr. Lee is representing Nevro at a neuromodulation industry conference in March 2014 called "Mechanisms of Action: Electrical Stimulation of the Nervous System." (*Id.* ¶ 27.) Before Dr. Lee left Boston Scientific, he had been scheduled to present at this very conference on behalf of Boston Scientific. (*Id.*) The conference is a "one of a kind scientific meeting," that will focus on "what is known and not known today regarding Mechanisms of Action (MOA) of electrical stimulation of targets including[] the brain, spinal cord, peripheral nervous system," and other parts of the body. (Chester Decl. Ex. A.) Presentations at this conference will include information on "current clinical uses and clarify[ing] mechanisms of action of neurostimulation, the exploration of neuroengineering tools to better understand mechanisms of action (MOA) and . . . the most up-to-date research that will potentially advance the uses of electrical stimulation." (*Id.*) The "learning objectives" for the conference are for participants to:

> (1) obtain an understanding of the most current scientific information on the electrical stimulation of differing targets in the body;
>
> (2) understand the continuing need for development of new mechanisms of action; and
>
> (3) learn about emerging techniques for treating disease through the use of electrical stimulation.

---

[3] Nevro sells a device that competes with Boston Scientific's SCS products in Europe and Australia—called Senza®—and Nevro anticipates receiving FDA approval in 2014 to sell this device in the United States. (Carbunaru Decl. ¶¶ 28-29.) Like Boston Scientific, Nevro is researching the mechanism of action for SCS therapy. (*See id.* ¶ 27.)

(*Id.*)  By listing himself as a faculty member at the conference who is appearing on behalf of Nevro, Dr. Lee has publicly affirmed that he is going to continue working on research related to the SCS mechanism of action (research he cannot perform without using and disclosing the information he learned and developed while at Boston Scientific) for one of Boston Scientific's direct competitors.  (*See id.* ¶ 21.)

Dr. Lee's Agreement with Boston Scientific prohibits him from using or disclosing the very information that he is now using to do his work at Nevro.  By working for Nevro on the SCS mechanism of action, Dr. Lee is using the Proprietary Information that he learned, developed, and used while working for Boston Scientific.  This conduct breaches Dr. Lee's Agreement.

### B. Boston Scientific Is Likely To Prevail on Its Trade Secret Claim

Massachusetts law provides that whoever "steals or unlawfully takes, carries away, conceals, or copies, or by fraud or by deception obtains, from any person or corporation, with intent to convert to his own use, any trade secret, regardless of value, shall be liable in tort to such person or corporation for all damages resulting therefrom." Mass. Gen. Laws ch. 93 § 42; *see Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 & n.1; *Sutra, Inc. v. Iceland Express, ehf*, 2008 WL 2705580 *3 (D. Mass. July 10, 2008). Massachusetts law also provides that when a former employee takes and uses trade secrets in violation of an employment agreement—as Dr. Lee did here—the court "shall" issue an injunction to stop this conduct.  Mass. Gen. Laws ch. 93 § 42A.

"Under Massachusetts law, a plaintiff must establish three elements to demonstrate tortious misappropriation of a trade secret: 1) the information at issue must constitute a trade secret, 2) the plaintiff must have taken reasonable steps to secure the

confidentiality of the trade secret, and 3) the defendant must have used improper means to obtain the trade secret." *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 238 (D. Mass. 2011). All three elements are satisfied here.

### 1. Dr. Lee possesses Boston Scientific's trade secrets.

Under Massachusetts law, a "trade secret" includes "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement." Mass. Gen. Laws ch. 266 § 30; *see* Mass. Gen. Laws ch. 93 § 42. The factors relevant to determining whether information is a trade secret are:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Optos,* 777 F. Supp. 2d at 239 (quoting *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972)).

Dr. Lee has specialized knowledge about Boston Scientific's research into the mechanism of action for SCS and related feasibility studies. (Carbonaru Decl. ¶¶ 10-15.) This information is closely guarded, and is not known outside of Boston Scientific. (*Id.* ¶¶ 8, 15, 31.) Boston Scientific took great care to keep this information confidential, requiring its employees to treat the information with the strictest of confidentiality by signing non-disclosure agreements. (*Id.*) Boston Scientific has also required outside

8

researchers who worked with Dr. Lee to sign non-disclosure agreements regarding the contents and results of their collaboration with Boston Scientific and Dr. Lee.  (*Id.* ¶ 15.)

The information that Dr. Lee possesses about Boston Scientific's research into the mechanism of action for SCS and the related feasibility studies are extraordinarily valuable both to Boston Scientific, and to its competitors. (*Id.* ¶¶ 8, 15, 31.)  Boston Scientific spends many millions of dollars to develop and market its products, and it expends significant resources in training its employees to understand—and further develop—the Proprietary Information they receive.  (*Id.* ¶¶ 8-17.)  This information could not be easily recreated without having gone through the trial-and-error of the research process to understand how the process works—something Dr. Lee has done.

### 2. Boston Scientific took reasonable steps to protect the confidentiality of its trade secrets.

To determine whether a company took reasonable steps to protect its trade secrets, courts consider:

> (1) the existence or absence of a [confidentiality agreement], (2) the nature and extent of precautions taken, (3) the circumstances under which the information was disclosed and (4) the degree to which the information has been placed in the public domain or rendered readily ascertainable.

*Optos*, 777 F. Supp. 2d at 239-40 (citation omitted).  The standard is "reasonableness, not perfection."  *Touchpoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 30 (D. Mass. 2004); *see USM Corp. v. Marson Fastener Corp.*, 379 Mass. 80, 101 (1979) (holding that Massachusetts law does "not require the possessor of a trade secret to take heroic measures to preserve its secrecy").

Boston Scientific entered into a confidentiality agreement with Dr. Lee and others who obtained similar information from Boston Scientific. Besides these agreements, and the care with which the company treated this information, Boston Scientific met extensively with Dr. Lee before his departure to explain his confidentiality obligations under the Agreement, even saying that he may not be able to work in certain capacities because of the sensitive information he possessed about Boston Scientific. (Carbunaru Decl. ¶¶ 21-23.) The information was disclosed to Dr. Lee only on condition that he sign the Agreement and keep it confidential. (Agreement §§ 1, 3.) Boston Scientific gave him the information on the express condition—and Dr. Lee's promise—that he use it only to benefit Boston Scientific. Finally, Boston Scientific's confidential research about SCS and its competitive plans against Nevro are not in the public domain.

### 3.   Dr. Lee used improper means.

Dr. Lee's providing trade secrets and Proprietary Information to Nevro through the breach of his non-disclosure agreement is wrongful (i.e., "improper") under Massachusetts law. *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1165 (1st Cir. 1994), *abrogated on other grounds*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *see also Optos*, 777 F. Supp. 2d at 240. Dr. Lee is working for Nevro, doing the same kind of research, for the same type of therapies that he worked on for Boston Scientific. The Proprietary Information—regarding the SCS mechanism of action and related feasibility studies—relates to these same areas. This improper conduct supports Boston Scientific's claim under Massachusetts trade secret law.

### III.     Boston Scientific Will Suffer Irreparable Harm Without An Injunction

Dr. Lee's continued work for Nevro—in the very area in which he worked for Boston Scientific—makes it impossible for him to keep confidential his knowledge of Boston Scientific's Proprietary Information, which includes trade secrets.  Even if Dr. Lee's motivations are pure, he cannot work on the SCS mechanism of action and conduct related feasibility studies for Nevro without disclosing "what he knows" from working for Boston Scientific.  Dr. Lee cannot "simply forget or ignore" all of the information that he acquired from Boston Scientific upon beginning his employment with Nevro.  *U.S. Elec. Serv., Inc. v. Schmidt*, Civ. Action No. 12-10845-DJC, 2012 WL 2317358 at *10 (D. Mass. June 19, 2012).  Rather, "what [he] knows about [Boston Scientific] is bound to influence what he does for [Nevro], and to the extent it does, [Boston Scientific] will be disadvantaged."  *Marcam*, 885 F. Supp. at 297.  Given the extent of Dr. Lee's experience at Boston Scientific, and the similarity between his positions at Boston Scientific and Nevro, disclosure of the Proprietary Information that Dr. Lee knows is inevitable.  *See Aspect Software, Inc. v. Barnett,* 787 F. Supp. 2d 118, 130 (D. Mass. 2011).  This is causing, and will continue to cause, irreparable harm to Boston Scientific because the loss cannot be measured in dollars.

Courts in this District consistently hold that when a former employee will inevitably disclose trade secrets and other information that he is bound by contract (or other law) to keep secret, inevitable disclosure of that information causes irreparable harm to the former employer.  As this Court has held, "even sincere, scrupulous efforts by an employee and his or her new employer to protect a prior employer's trade secrets are insufficient to remove the threat of irreparable harm via disclosure of trade secrets."

11

*Aspect,* 787 F. Supp. 2d at 130-31; *see Corporate Tech.*, 943 F. Supp. 2d. at 243 (finding irreparable harm because the defendant "cannot wipe his mind of the confidential . . . information he learned while employed at [plaintiff] and will inevitably call upon that information" when working for his new employer); *Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d 432, 442 (D. Mass. 2010) (holding that it is "impossible to imagine" that former employees "will not use, consciously or not, information they have gleaned" during their time with the former employer); *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995) ("It is difficult to conceive how all of the information stored in [employee's] memory can be set aside as he applies himself to a competitor's business and its products."); *C.R. Bard, Inc. v. Intoccia*, Civ. A. No. 94-11568-Z, 1994 WL 601944 at *3 (D. Mass. Oct. 13, 1994) (holding that former employer will be irreparably harmed if the "project manager of its major project joins its competitor," where defendant "could not leave behind his special knowledge of plaintiff's operation"); *see also U.S. Elec.*, 2012 WL 2317358 at *9 ("[T]he inevitable disclosure doctrine may be used to establish irreparable harm once a party seeking an injunction has already established a likelihood of success on the merits.").

Because Dr. Lee will inevitably disclose Boston Scientific's Proprietary Information and trade secrets, Boston Scientific will suffer irreparable harm if the Court does not issue a preliminary injunction.

### IV.   The Balance of Harms Favors Boston Scientific

The Court must balance any "potential harm caused to [Boston Scientific] by a denial of its motion . . . against any reciprocal harm caused to [Dr. Lee] by the imposition of an injunction." *TouchPoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23,

32 (D. Mass. 2004).  Boston Scientific is asking for an injunction temporarily to prevent Dr. Lee from working for Nevro studying the SCS mechanism of action and related feasibility studies.  (*See* Complaint at 15.)

The ongoing irreparable harm that Boston Scientific is suffering from Dr. Lee's disclosure of Boston Scientific's Proprietary information tips the balance toward an injunction.  There is simply no good way to promptly remedy Dr. Lee's disclosures—and there is no way to retroactively compensate Boston Scientific for those disclosures—other than a preliminary injunction.  Any potential risk that Dr. Lee may face due to lost income during the injunction can be addressed through the bond that Boston Scientific is prepared to post.  *See* Fed. R. Civ. P. 65(c).

### V. The Public Interest Favors an Injunction.

"Massachusetts has a clear public policy in favor of strong protections for trade secrets."  *Optos,* 777 F. Supp. at 242.  Here, Dr. Lee possesses extensive trade secrets and other Proprietary Information that belong to Boston Scientific.  He signed a contract, promising to keep that information secret.  He has broken that contract, and it is in the public interest to enjoin his further breach of his Agreement.

**CONCLUSION**

Despite promising to use Boston Scientific's Proprietary Information only for Boston Scientific's benefit, Dr. Lee now has taken a job in which he will use that information for Nevro. By breaking his promise, Dr. Lee is causing Boston Scientific irreparable harm. Boston Scientific respectfully asks the Court to issue an injunction requiring Dr. Lee to honor his contract and to stop preforming any work for Nevro that causes him to use or disclose Boston Scientific's Proprietary Information.

Dated: December 20th, 2013

>OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
>
>/s/ Patrick M. Curran, Jr.
>Patrick M. Curran, Jr.
>One Boston Place Suite 3220
>Boston, MA 02108
>617-994-5728
>patrick.curran@ogletreedeakins.com
>
>Of counsel:
>
>FAEGRE BAKER DANIELS LLP
>
>Robert L. Schnell, Jr., *pro hac vice pending*
>*robert.schnell@faegrebd.com*
>Martin S. Chester, *pro hac vice pending*
>*martin.chester@faegrebd.com*
>Eileen M. Hunter, *pro hac vice pending*
>*eileen.hunter@faegrebd.com*
>2200 Wells Fargo Center
>90 South Seventh Street
>Minneapolis, MN 55402-3901
>(612) 766-7000
>
>*Attorneys for Plaintiff Boston Scientific Corporation*

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Dongchul Lee by U.S. mail on December 20th, 2013.

        /s/ Patrick M. Curran, Jr.
        Patrick M. Curran, Jr.

=