UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
BOSTON SCIENTIFIC CORPORATION,  )
                                    )
              Plaintiff,            )
v.                                  )       CASE NO. 1:13-cv-13156
                                    )
                                    )
DONGCHUL LEE,                       )
                                    )
              Defendants.           )
                                    )
```

## DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Defendant Dongchul Lee ("Dr. Lee") hereby submits his Opposition to Plaintiff Boston Scientific Corporation's ("Boston Scientific") Motion for Preliminary Injunction.

Boston Scientific <u>admits</u> that it has no actual evidence that Dr. Lee disclosed any Proprietary Information or breached any restrictive covenant.  In an attempt to overcome this fatal flaw in its case, Boston Scientific misuses the inevitable disclosure doctrine to establish a vague and speculative future breach of contract.[1]  In <u>U.S. Elec. Servs. v. Schmidt</u>, 2012 U.S. Dist. LEXIS 84272 (2012), this very Court held the inevitable disclosure doctrine <u>cannot</u> be used to establish a likelihood of success on the merits.

In addition, Boston Scientific's Motion for Preliminary Injunction must be denied for several independent reasons.  First, Boston Scientific cannot establish a likelihood of success on the merits because the "trade secrets" alleged in the pleadings have long been in the public domain and have been independently developed, published, and/or patented by Nevro Corporation ("Nevro").  Second, Boston Scientific cannot establish irreparable harm

---

[1] Boston Scientific's only allegation of a breach is, "[g]iven the extent of Dr. Lee's experience at Boston Scientific, and the similarity between his positions at Boston Scientific and Nevro, disclosure of the Proprietary Information that Dr. Lee knows is inevitable." (PI Mem., g. 11).

because there is no danger that Dr. Lee will use or disclose any of Boston Scientific's Proprietary Information while conducting mechanism of action (MOA) research on Nevro's proprietary and patented HF10™ SCS therapy. Third, the balance of hardships between Boston Scientific and Dr. Lee, as well as general public policy, support this Court's denial of Boston Scientific's Motion for Preliminary Injunction.

## FACTS

### Dr. Dongchul Lee

Dr. Lee earned a Bachelor of Science from Chung-Ang University in Seoul, Korea in 1993, and a Masters of Science in Electrical Engineering from the University of Houston in Houston, Texas in 1997. (Aff. Lee ¶¶ 1-2). In 2004, he earned a PhD in Biomedical Engineering from Case Western Reserve University in Cleveland, Ohio. (Aff. Lee ¶4).

During his PhD program, Dr. Lee concentrated in computer modeling. In fact, Dr. Lee's PhD dissertation was focused on computational modeling of the central nervous system and electrical stimulation of the nervous system. (Aff. Lee ¶ 5). The skills Dr. Lee learned and developed with respect to computer modeling were obtained during his PhD program. (Aff. Lee. ¶6).

### Differences Between Low Frequency and High Frequency SCS Systems

Spinal cord stimulation (SCS) therapy is generally used to treat chronic pain in patients. (Aff. Elghandour ¶4). In short, a pulse generator sends electrical pulses to the spinal cord, which affect nerve impulses that cause pain. (Aff. Elghandour ¶ 4).

Conventional SCS therapy is commonly referred to as "low frequency" SCS, which denotes the delivery of electrical pulses at a frequency below 1,200 Hz, and most often

2

below 100 Hz.  (Aff. Elghandour ¶ 5).  In addition, conventional low frequency SCS therapy generates paresthesia (i.e., a tingling sensation resulting from the stimulation of the spinal cord), which can be used to mask the patient's pain.  (Aff. Elghandour ¶ ¶5, 19) (Aff. Lee ¶ 11).

As is commonly known in the SCS industry, Boston Scientific, Medtronic Inc., and St. Jude Medical Inc. each sell "low frequency" SCS systems, and use sophisticated programming algorithms (known as "paresthesia mapping" programs) to cover a patient's area of pain with the generated paresthesia, to thereby mask the patient's sensation of pain. (Aff. Lee ¶ 11) (Aff. Elghandour ¶ 19).

Dr. Lee's new employer, Nevro, developed and commercialized a novel type of SCS therapy that uses a form of "high frequency" stimulation to treat chronic pain.  (Aff. Elghandour ¶ 5).  Unlike conventional "low frequency" SCS, Nevro's Senza® system and associated HF10™ SCS therapy delivers electrical pulses at a frequency of 10,000 Hz (or 10 kHz), as opposed to delivering electrical pulses at a frequency below 1,200 Hz, as in low frequency SCS therapy.  More importantly, while conventional low frequency SCS therapy generates paresthesia, Nevro's HF10™ SCS therapy does not generate or use paresthesia.  In other words, Nevro's HF10™ SCS therapy is able to alleviate a patient's sensation of pain without generating or using paresthesia to mask a patient's sensation of pain.  (Aff. Elghandour ¶ 5).  Further, because Nevro's HF10™ SCS therapy does not generate or use paresthesia, it does not utilize paresthesia mapping programs to cover a patient's area of pain with paresthesia.  (Aff. Elghandour ¶ 19).

Since its inception in 2006, Nevro has invested significantly in the development and protection of its novel SCS technology.  (Aff. Elghandour ¶7).  Nevro has protected its

3

novel, high frequency SCS technology with a substantial portfolio of U.S. and foreign patents. (Aff. Elghandour ¶ 8). Among other things, Nevro's patents and published applications are directed to its methods for programming Nevro's HF10™ SCS therapy, as well as other high frequency systems, and MOA theories independently developed by Nevro. (Aff. Elghandour ¶ 8).

**Dr. Lee's Employment with Boston Scientific**

In 2006, Dr. Lee accepted a position as a Senior Biomedical System Engineer with Boston Scientific in its Valencia, California location. (Aff. Lee ¶ 7). While at Boston Scientific, Dr. Lee used the experience and knowledge he obtained while earning his PhD to develop a computer model of the spinal cord. (Aff. Lee ¶ 8). The computer model he built for Boston Scientific was publicly presented in 2007 and later published in 2011 in a peer-review journal. (Aff. Lee ¶ 8, Ex. 1). Dr. Lee did not develop any computer models of the spinal cord for Boston Scientific other than the one published in 2011. (Aff. Lee ¶ 9).

During his employment with Boston Scientific, Dr. Lee also worked on programming algorithms. (Aff. Lee ¶ 10). The algorithms he worked on were related to sophisticated programs to "map" paresthesia over a patient's sensation of pain. (Aff. Lee ¶ 10). Many of the programming algorithms on which Dr. Lee worked were incorporated into commercial products and/or submitted as patent applications. (Aff. Lee ¶10).

During Dr. Lee's last two years of employment with Boston Scientific, he worked on MOA research, which was aimed at determining why low frequency clinical SCS therapy is effective. (Aff. Lee. ¶ 11).

4

**Dr. Lee's Employment with Nevro**

In 2013, Dr. Lee became dissatisfied with his career opportunities at Boston Scientific. (Aff. Lee ¶ 13). As a result, he decided to resign. Dr. Lee considered starting a consulting company, and discussed providing consulting services to Boston Scientific (as well as other SCS companies). (Aff. Lee ¶ 13). When Nevro learned that Dr. Lee was leaving Boston Scientific, Nevro offered him a job. (Aff. Lee ¶16). Dr. Lee. accepted Nevro's offer and officially began working for Nevro on November 8, 2013. (Aff. Lee ¶ 16).

On November 7, 2013, before Dr. Lee began working for Nevro, he signed a Proprietary Information Contract, which amongst other things, states:

> During my employment by [Nevro], I will not improperly use or disclose any confidential information, intellectual property or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of [Nevro] any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless expressly authorized in writing by that former employer or person. I will use in the performance of my duties only information which is generally known and used by persons with training and experience comparable to my own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by [Nevro]. (Aff. Lee ¶ 18); (Aff. Elghandour ¶35).

Dr. Lee has and will continue to honor the terms of this agreement with Nevro, and the Confidentiality Agreement with Boston Scientific. (Aff. Lee ¶ 19).

**Dr. Lee's Job Duties at Nevro**

Dr. Lee performs the following job duties at Nevro:

a. Assists with the development of a computational model to explain how

Nevro's proprietary, paresthesia-free HF10™ SCS therapy may be affecting

the spinal cord.  Dr. Lee's work on Nevro's computational model is based on clinical evidence and findings that existed at Nevro before he became employed.  The computational model he is working on is being developed from scratch, and informed by publicly available scientific literature.  The computational model he is working on will include anatomical variables and structures that were never considered or investigated by SCS researchers (including Dr. Lee's efforts at Boston Scientific) before now.  Further, the computational model he is building for Nevro is inherently different than the one he built for Boston Scientific because only Nevro has clinical experience with their proprietary, paresthesia-free HF10™ SCS therapy, which is necessary to develop this type of computer model.  The work Dr. Lee did on Boston Scientific's computer model is not useful to his work at Nevro because the anatomical variables, electrical inputs, and clinical observations used in creating the computer model are different.

b.  Assists with research related to the physiological responses to Nevro's specific HF10™ SCS therapy.

c.  Assists in the testing of optimal stimulation parameters for Nevro's HF10™ SCS therapy.

d.  Explores new indications for using Nevro's HF10™ SCS therapy.

(Aff. Lee ¶ 21).

Importantly, all of Dr. Lee's job duties, research, and work are specifically related to Nevro's unique HF10™ SCS therapy and is based entirely on clinical data that only Nevro possesses.  (Aff. Lee ¶ 22).  Upon information and belief, Boston Scientific does not

6

have an SCS system that can produce Nevro's (patented) paresthesia-free HF10™ SCS therapy in a clinical setting. (Aff. Lee ¶ 22); (Aff. Elghandour ¶14). Further, upon information and belief, Boston Scientific does not have the clinical experience with HF10™ SCS therapy necessary to perform the research Dr. Lee is now performing for Nevro. (Aff. Lee ¶ 22); (Aff. Elghandour ¶ 14). To the extent that Boston Scientific has such information, Dr. Lee was not privy to it. (Aff. Lee ¶ 22).

In short, all of Dr. Lee's job duties, research, and work at Nevro are based on an SCS therapy and clinical evidence that Nevro independently developed. (Aff. Lee ¶ 22).

## There is No Inevitable Disclosure of Trade Secrets or Confidential Information

The trade secrets and confidential information that Boston Scientific alleges Dr. Lee will "inevitably disclose" in his work for Nevro are: (1) algorithms for programming SCS systems; (2) mechanism of action research; and (3) computer modeling of the human nervous system.

### *Algorithms for Programming SCS Systems*

The programming algorithms Dr. Lee developed at Boston Scientific have been published and are already in the public domain. (Aff. Lee ¶ 24). However, even if they were not, Dr. Lee has not and would never disclose or use the same algorithms for his work at Nevro for three reasons. (Aff. Lee ¶25). First, the algorithms he worked on for Boston Scientific were related to low frequency (i.e., under 1,200 Hz), paresthesia mapping. Nevro's product cannot utilize paresthesia mapping programs of any form because it does not generate or use paresthesia. (Aff. Lee ¶ 25); (Aff. Elghandour ¶ 19). As a result, Nevro cannot possibly utilize Boston Scientific's programing algorithms. (Aff. Elghandour ¶ 19).

7

Second, Nevro has no commercial interest in Boston Scientific's algorithms for programming low frequency SCS systems.  As opposed to Boston Scientific, Nevro is not working on the ability to customize the sensation [i.e., paresthesia] felt by patients because Nevro's HF10™ SCS therapy does not generate paresthesia (or any sensation).  (Aff. Elghandour ¶ 19).  The disclosure of Boston Scientific's programming algorithms to Nevro would be akin to teaching Nevro how to solve a problem that it does not have.  (Aff. Elghandour ¶ 19).  As a result, the low frequency paresthesia mapping algorithms Dr. Lee developed at Boston Scientific are not relevant to Nevro's independently developed 10 kHz, paresthesia-free HF10™ SCS therapy.  (Aff. Lee ¶ 25); (Aff. Elghandour ¶ 19).

Third, to date, Dr. Lee has not worked on any programming algorithms of any form for Nevro.  (Aff. Lee ¶ 26).

### Mechanism of Action (MOA) Research

Prior to Dr. Lee's joining Nevro, Nevro had independently begun researching the MOA of 10 kHz, paresthesia-free SCS therapy (i.e., Nevro's proprietary HF10™ SCS therapy).  (Aff. Lee 28); (Aff. Elghandour ¶ 20).  In other words, Nevro was independently researching why its paresthesia-free HF10™ SCS therapy is effective without using conventional, low frequency, paresthesia mapping (as used in Boston Scientific's system) to mask a patient's sensation of pain.  (Aff. Lee ¶ 12).

Nevro has clinical data from both animal and human studies, which it uses for its continued MOA research.  (Aff. Lee ¶ 28).  This research started long before Dr. Lee was hired by Nevro.  (Aff. Lee ¶ 28); (Aff. Elghandour ¶ 23).  Upon information and belief, Boston Scientific does not have an SCS system that can produce Nevro's (patented) paresthesia-free HF10™ SCS therapy in a clinical setting.  (Aff. Lee ¶ 29).  Boston

8

Scientific does not have clinical experience with Nevro's paresthesia-free HF10™ SCS therapy. (Aff. Lee ¶ 29). To the extent that Boston Scientific does have an SCS system that can produce Nevro's (patented) paresthesia-free HF10™ SCS therapy in a clinical setting, such system was not made available to Dr. Lee in conducting his MOA research at Boston Scientific. (Aff. Lee ¶ 29).

The information Dr. Lee learned from conducting low frequency, paresthesia-based MOA clinical research at Boston Scientific is not necessary for the MOA research he will be conducting at Nevro. (Aff. Lee ¶ 30). Nevro has no commercial interest in knowing or understanding Boston Scientific's MOA research on conventional low frequency SCS therapy. Nevro is interested in researching the MOA for its own 10 kHz, paresthesia-free HF10™ SCS therapy. (Aff. Elghandour ¶ 20). Such MOA research was in progress well before the arrival of Dr. Lee. (Aff. Elghandour ¶ 20)

Furthermore, there are numerous publications on MOA research, some of which have been published by Nevro and some by Boston Scientific. (Aff. Lee ¶ 31). In fact, Nevro has several published patents and patent applications where it discloses its independently derived MOA research and theories. (Aff. Lee ¶ 31). This information is in the public domain. In addition, MOA research is frequently discussed in the medical and scientific community, as evidenced by the conference Boston Scientific refers to in its pleadings called "Mechanisms of Action: Electrical Stimulation of the Nervous System." (Aff. Lee ¶ 32).

*Computer Modeling of the Human Nervous System*

Computer modeling of the human nervous system is used by all of the spinal cord stimulation companies. (Aff. Lee ¶ 33). Computer modeling is not a trade secret or

9

confidential, and there are numerous publications on computer modeling of the spinal cord system.  In 1998, Jan Holsheimer published a review of multiple publicly available computer models.  (Aff. Lee ¶ 33, Ex. 3).  Dr. Lee's work on computer modeling at Boston Scientific was published in a peer-review journal in 2011.  (Aff. Lee ¶ 33, Ex. 1).

Dr. Lee is currently working on a new computational model to help explain how Nevro's paresthesia-free HF10™ SCS therapy may be affecting the spinal cord.  (Aff. Lee ¶ 34).  The computer model he built for Boston Scientific was not directed toward explaining how Nevro's paresthesia-free HF10™ SCS therapy affects the spinal cord. (Aff. Lee ¶ 34).  The computational model Dr. Lee is working on for Nevro is being developed from scratch, and is informed by publicly available scientific literature.  (Aff. Lee ¶ 35); (Aff. Elghandour ¶ 21).  In addition, the computational model he is working on for Nevro will include the anatomical variables and structures not previously considered by SCS researchers.  (Aff. Lee ¶35); (Aff. Elghandour ¶ 21).  These anatomical variables and structures are different than those used or understood by Boston Scientific.  (Aff. Lee ¶35).

**Dr. Lee is Not Involved in Product Development**

Nevro's Senza® SCS system and HF10™ SCS therapy has been commercially available in Europe and Australia, since 2010 and 2011, respectively.  (Aff. Elghandour ¶ 16).  Dr. Lee has not participated in any way in the development of Nevro's commercially available Senza® SCS system, or Nevro's commercially available HF10™ SCS therapy. (Aff. Lee. ¶27).  He is not part of Nevro's Research and Development efforts.  Nevro's Senza® SCS system and HF10™ SCS therapy are currently under FDA review.  Dr. Lee will have no input on the U.S. commercial launch of Nevro's Senza® SCS system and/or HF10™ SCS therapy.  (Aff. Lee ¶ 27).

**There Has Been No Breach of Contract**

Dr. Lee has not used or disclosed any trade secrets or confidential information belonging to Boston Scientific, and there is absolutely no need for him to divulge or use any of this information for his work at Nevro. (Aff. Lee ¶¶ 43, 45); (Aff. Elghandour ¶¶ 28- 34). Nevro has never once asked Dr. Lee to disclose trade secrets or confidential information belonging to Boston Scientific. (Aff. Lee ¶ 17).

**This Litigation**

On December 26, 2013, without ever trying to contact Dr. Lee beforehand, Boston Scientific served Dr. Lee with its Complaint alleging that Dr. Lee's work with Nevro "necessarily entails" his disclosure of Boston Scientific Proprietary Information.[2] For the reasons explained below, this is simply not true.

## ARGUMENT

### I.   BOSTON SCIENTIFIC MUST MEET A HEAVY BURDEN TO PREVAIL ON THIS MOTION FOR PRELIMINARY INJUNCTION

Injunctive relief is an "extraordinary remedy" which is "never awarded as a matter of right." Winter v. NRDC, Inc., 555 U.S. 7, 24 (2008); see also Gut v. MacDonough, 2007 Mass. Super. LEXIS 382, *49, C.A. No. 07-1083 (Agnes, J.) (Aug. 20, 2007). In order to prevail, the movant, by a "clear showing," must meet its burden of proving: (1) a likelihood of success on the merits; (2) that irreparable harm will result from denial of the injunction; and (3) that, in light of the likelihood of success on the merits, the risk of irreparable harm to the plaintiff outweighs the potential harm to the defendant in granting

---

[2] In its Complaint, Boston Scientific seeks to enjoin Dr. Lee from working "in any capacity related to [1] computer modeling of the human nervous system …, [2] developing algorithms for use in programming neuromodulation systems, or [3] discovering the mechanism of action for SCS." However, despite the apparent urgency of filing this case and serving Dr. Lee over the holidays, Boston Scientific's Motion for Preliminary Injunction does not seek to enjoin Dr. Lee from working on (1) computer modeling or (2) developing programming algorithms, focusing instead on the MOA research.

the injunction.  See Anderson v. LAM Builders, Inc., 2004 Mass. Super. LEXIS 414, *4,

C.A. No. 03-1106 (Hillman, J.) (Sept. 17, 2004) (citation omitted); Packaging Indus.

Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980).

For the reasons set forth below, Boston Scientific has not met its heavy burden.

## II.     BOSTON SCIENTIFIC HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS

### A. The Inevitable Disclosure Doctrine Cannot be Used to Establish a Likelihood of Success on the Merits

In its pleadings, Boston Scientific presents no evidence that Dr. Lee has breached

his non-disclosure agreement.  Instead, Boston Scientific advances a circular argument

with conspicuous leaps in logic: Dr. Lee is working for Nevro; hence, he "must" be doing

"the same kind of research" he did for Boston Scientific; therefore, Dr. Lee "must be"

improperly disclosing trade secrets and confidential information belonging to Boston

Scientific.  Based on this dubious set of allegations, Boston Scientific asks the Court to

enter an injunction preventing Dr. Lee from working for Nevro despite: (1) the absence of

a non-compete; and (2) no evidence that Dr. Lee is disclosing or using trade secrets or

confidential information.

Boston Scientific cannot rely on the inevitable disclosure doctrine to demonstrate a

likelihood of success on the merits.  As this Court is well aware, there are four seminal

cases involving the inevitable disclosure doctrine.[3]  In the last to be decided, U.S. Elec.

Servs. v. Schmidt, 2012 U.S. Dist. LEXIS 84272 (2012), this Court addressed this very

issue, holding as follows:

---

[3] The four cases are Marcam Corp. v. Orchard, 885 F.Supp. 294 (D. Mass. 1995); Lombard Medical Techs., Inc. v. Johannessen, 729 F. Supp. 2d 432 (D. Mass. 2010); Aspect Software, Inc. v. Barnett, 787 F. Supp. 2d 118 (D. Mass. 2011); and U.S. Elec. Servs. v. Schmidt, 2012 U.S. Dist. LEXIS 84272 (D. Mass. 2012).

[In all prior cases involving the inevitable disclosure doctrine], the plaintiff established the likelihood of success on the merits of a breach of contract claim **based on a non-competition agreement, not (as here) a pure trade secrets claim, and in each case the plaintiff alleged that the defendant's breach had already occurred by the time of the preliminary injunction proceedings, not (as here) merely that the defendant's actionable conduct was imminent and inevitable**. Marcam, 885 F.Supp. at 298-99; Lombard, 729 F. Supp. 2d at 438-41; Aspect, 787 F. Supp. 2d at 127-130. The three cases each discussed inevitable disclosure only in the context of establishing irreparable harm. Marcam, 885 F. Supp. at 297-98; Lombard, 729 F. Supp. 2d at 441-42; Aspect, 787 F. Supp. 2d at 130-31. Accordingly, although the cases offered by [plaintiff] make clear that the inevitable disclosure doctrine may be used to establish irreparable harm once a party seeking an injunction has already established a likelihood of success on the merits, they do not show that a party may rely solely on inevitable future conduct, rather than conduct that has actually occurred, to establish a likelihood of success on the merits of a trade secrets appropriation claim or a breach of confidentiality claim, as [plaintiff] seeks to do here.
(emphasis added)

Here, just as in <u>U.S. Elec. Servs.</u>, there is no non-compete agreement, or any evidence of any breach of contract or violation of statute. More specifically, there is no evidence that Dr. Lee has disclosed or used Boston Scientific's trade secrets or confidential information. Instead, without greater detail, Boston Scientific alleges only that disclosure is inevitable by virtue of Dr. Lee's employment with a competitor.

In his affidavit in support of this Opposition, Dr. Lee attests to the fact that: (a) he has not disclosed any of Boston Scientific's Proprietary Information; (b) he does not need to disclose any of Boston Scientific's Proprietary Information to perform his duties at Nevro; and (c) he is actually contractually obligated to Nevro <u>not</u> to disclose any Proprietary Information from any of his previous employers. (Aff. ¶¶ 18-20, 43-45). Further, in his affidavit, Dr. Lee provides numerous examples and reasons why he can - and does - perform his duties at Nevro without disclosing Boston Scientific's Proprietary Information. Most notably, contrary to Boston Scientific's assertions, Dr. Lee's MOA research into Nevro's novel, paresthesia-free HF10™ SCS therapy is different from the

13

MOA research he was performing at Boston Scientific. (Aff. Lee ¶¶ 28-32). In other words, Boston Scientific's suggestion that Dr. Lee is doing "the same work at Nevro that he did at Boston Scientific" is simply not true.[4]

In the affidavit filed by Rami Elghandour of Nevro, Mr. Elghandour also attests that Dr. Lee: (a) has not disclosed any of Boston Scientific's Proprietary Information; (b) does not need to disclose any of Boston Scientific's Proprietary Information to perform his duties at Nevro; and (c) is contractually obligated to Nevro not to disclose any Proprietary Information from any of his previous employers. (Aff. Elghandour ¶¶ 29-35). Mr. Elghandour also attests that Nevro has invested significant time and money in developing, commercializing, and patenting its novel, paresthesia-free HF10™ SCS therapy. (Aff. Elghandour ¶ 23). In addition, the MOA research of Nevro's HF10™ SCS therapy has been ongoing and began prior to Dr. Lee joining Nevro, has been published in peer-review journals and in Nevro's patents, and does not require knowledge of Boston Scientific's MOA research. (Aff. Elghandour ¶¶ 16, 23, 31).

Boston Scientific has put forth absolutely no evidence that a breach of contract or disclosure of Proprietary Information has occurred. Nor has Boston Scientific given sound reason as to why a breach of contract or disclosure of Proprietary Information must occur. Boston Scientific has instead tried to blur the lines between Nevro's paresthesia free HF10™ SCS therapy and Boston Scientific's conventional, low frequency, paresthesia-based SCS therapy.

---

[4] With regard to the categories of (1) computer modeling, and (2) programming algorithms, Dr. Lee has attested to the fact that he is (1) tasked with developing a new computer model, from scratch and informed by publicly available information, for Nevro's novel HF10™ SCS therapy, and (2) is not working on programming algorithms of any sort. (Aff. Lee, ¶¶27, 35).

14

Dr. Lee performs his work for Nevro without using or disclosing any trade secret or confidential information he learned while working for Boston Scientific. Dr. Lee has not disclosed any trade secrets or confidential information belonging to Boston Scientific. (Aff. Lee ¶¶ 43-45). Accordingly, Boston Scientific cannot demonstrate a likelihood of success on the merits.

## B. Boston Scientific's Alleged Trade Secrets and Confidential Information Are in the Public Domain

In its Complaint, Boston Scientific alleges broad categories of information it claims are "trade secrets" and/or confidential information: (1) MOA research for SCS; (2) computer modeling of the human nervous system; and (3) algorithms for programming SCS Systems. As explained below, these categories of information are already in the public domain and therefore cannot be considered confidential or a trade secret. CVD, Inc. v. Raytheon Co., 769 F.2d 842, 850-51 (1st Cir. 1985) ("[t]he cornerstone of a trade secret, however, is secrecy. Once a trade secret enters the public domain, the possessor's exclusive rights to the secret are lost…); Harvard Apparatus, Inc. v. Cowen, 130 F. Supp. 2d 161, 175 (D. Mass. 2001) (quoting J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 260 N.E.2d 723, 729 (1970)) ("[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret").

### 1. MOA Research

Boston Scientific broadly claims that MOA research is confidential and a trade secret. MOA research, in-and-of-itself, is not a trade secret or confidential. There are a large number of publications on MOA research, including Nevro-sponsored publications and Nevro's own published patents and patent applications. (Aff. Elghandour ¶¶ 8-16). Further, as attested to in the affidavit by Mr. Elghandour, Nevro has performed significant

15

independently-derived MOA research well before Dr. Lee joined Nevro, and has published its findings.  (Aff. Elghandour ¶23).

### 2.  Computer Modeling of the Human Nervous System

Incredibly, without pleading anything more specific, Boston Scientific alleges that computer modeling of the human nervous system is a trade secret or confidential information belonging to Boston Scientific.  This is patently untrue.  Computer modeling of the nervous system has been around for decades.  There are numerous publications on computer modeling of the nervous system.  (Aff. Lee ¶ 33).  Dr. Lee actually concentrated in computer modeling during his PhD program, focusing on computational modeling of the central nervous system and electrical stimulation of the nervous system.  (Aff. Lee ¶ 5).

As evidenced by the 1998 publication attached to the Affidavit of Dr. Lee as Exhibit 3, Jan Holsheimer presented"[a]n overview of computer models developed since the late seventies, which enable the simulation of the primary effects of spinal cord stimulation (SCS) on nerve fibers."  (Aff. Lee, Ex. 3, Abstract).  Holsheimer further states: "[i]n this review the main aspects of SCS modeling are described.  It is also shown that computer modeling is a useful tool to distinguish parameters relevant to SCS and that the model predicts several characteristics of SCS known from clinical practice."  (Aff. Lee, Ex. 3, pg. 532).  Holsheimer then goes on to describe multiple computer models, including one developed by B. Coburn in 1980.

Even more telling, Boston Scientific actually published Dr. Lee's work on computer modeling in 2011.  (Aff. Lee ¶ 8, Ex. 1).  Published work can hardly be claimed as a trade secret or labeled confidential.

### 3. Algorithms for Programming SCS Systems

While employed by Boston Scientific, Dr. Lee worked on programming algorithms related to "paresthesia mapping," which is essentially customizing the tingling sensation patients feel when low frequency electrical pulses are delivered to the spinal cord so as to cover the patient's area of pain. Many of these programming algorithms were incorporated into commercial products and/or submitted as patent applications; therefore, they are in the public domain and are not trade secrets or confidential.[5]

Because Boston Scientific's alleged "trade secrets" are in the public domain, Boston Scientific cannot demonstrate a likelihood of success on the merits. Accordingly, Boston Scientific has not met its heavy burden to prevail on its Motion for Preliminary Injunction. As such, the motion must be denied.

### III. THERE IS NO IRREPARABLE HARM IN DENYING THE MOTION FOR PRELIMINARY INJUNCTION BECAUSE THERE IS NO DANGER THAT DR. LEE WILL DISCLOSE TRADE SECRETS OR CONFIDENTIAL INFORMATION

Even if Boston Scientific could establish a likelihood of success on the merits, which is clearly not the case, there is still no risk of irreparable harm because there is no danger of Dr. Lee actually disclosing the information he knows. In other words, Boston Scientific cannot simply proclaim "inevitable disclosure," and be done with the irreparable harm prong of the analysis. Since there is no need for Dr. Lee to disclose the information he knows, there is no "inevitability" that he will disclose the information.

---

[5] Even if Boston Scientific later claims to have very specific programming algorithms for its low frequency paresthesia-based SCS therapy, Dr. Lee and Mr. Elghandour have both attested to the fact that (a) Dr. Lee is not working on programming algorithms of any sort; and (b) Boston Scientific's programming algorithms are irrelevant (and in fact impossible to utilize) in Nevro's paresthesia-free HF10™ SCS therapy. (Aff. Lee 25-26); (Aff. Elghandour ¶¶ 19, 30).

17

As attested to in the affidavits of Dr. Lee and Mr. Elghandour, for each category of alleged "trade secret" or confidential information, Dr. Lee does not need to disclose Boston Scientific's Proprietary Information because Dr. Lee's job duties at Nevro do not require such disclosure (and, in fact, contractually mandate him not to disclose any such information).

Nevro is interested in researching the MOA for its own novel, 10 kHz, paresthesia-free HF10™ SCS therapy, and has no interest, and can gleam no commercial value, in the MOA research for Boston Scientific's low frequency, paresthesia-based SCS therapy. Simply put, Boston Scientific's MOA research is not needed for Nevro's ongoing MOA research. (Aff. Elghandour ¶ 20).

Boston Scientific's only specific allegation related to MOA research is as follows: "Boston Scientific asked Dr. Lee to lead a research effort that studied the sensations that patients feel during SCS therapy." Pl.'s Mem. Exp. Disc. p. 5. As explained above and in the affidavits by Dr. Lee and Mr. Elghandour, the "sensations that patients feel during SCS therapy" is wholly irrelevant to Nevro's paresthesia-free HF10™ SCS therapy. As a result, to the extent there are any trade secrets involved in studying paresthesia, there is no risk that Dr. Lee will use or disclose this information.

The same is true for Nevro's computer modeling. Indeed, long before Nevro hired Dr. Lee, Nevro had independently developed its own computational models specifically related to its high-frequency technology. (Aff. Elghandour ¶ 21). Boston Scientific's computer model is directed to its low-frequency SCS therapy, and is of no use, value, or interest to Nevro. (Aff. Elghandour ¶ 20).[6]

---

[6] It deserves repeating that the reason why it is well known that Boston Scientific's computer model is directed to its low-frequency SCS therapy is because it published Dr. Lee's work in a peer-review journal.

18

Further, Dr. Lee is working on an entirely different computer model for Nevro than the one he worked on for Boston Scientific. Dr. Lee is currently working on a computational model to help explain how Nevro's unique HF10™ SCS therapy may be affecting the spinal cord. (Aff. Lee ¶ 21). Dr. Lee is building a new computational model for Nevro, from scratch, and informed by publicly available scientific literature, to include anatomical variables and structures not previously considered by SCS researchers. (Aff. Lee ¶ 21). These anatomical variables and structures had been identified by Nevro before Dr. Lee was hired by Nevro. (Aff. Lee ¶ 21); (Aff. Elghandour ¶ 23).

Similarly, Boston Scientific's "paresthesia mapping" algorithms for programming its low frequency SCS systems are not relevant to Nevro's technology, and in fact cannot possibly be utilized with Nevro's paresthesia-free HF10™ SCS therapy. While Boston Scientific's SCS therapy requires sophisticated programming algorithms to cover a patient's painful areas with paresthesia, Nevro's HF10™ SCS therapy does not generate or use paresthesia to cover the patient's pain. For Boston Scientific to suggest that Nevro can even use Boston Scientific's paresthesia mapping algorithms in a system that does not have paresthesia is nonsensical. Further, as evidenced by Nevro's extensive patent filings, Nevro has independently developed its own programming methods for its novel, paresthesia-free HF10™ SCS therapy. (Aff. Elghandour ¶23).

As such, there is no danger of irreparable harm because there is no need, risk, or "inevitability" that Dr. Lee will disclose any confidential information he knows.

## IV.     THE BALANCE OF HARMS WEIGHS IN FAVOR OF DR. LEE

Through its motion, Boston Scientific asks this Court to convert a non-disclosure agreement into a non-compete in perpetuity. Dr. Lee has not violated his non-disclosure

obligations and is not using any trade secrets or confidential information belonging to Boston Scientific. (Aff. Lee ¶ 43). Despite this, and the absence of a non-compete, Boston Scientific seeks to prevent Dr. Lee from working for Nevro.

If the Court denies the motion for injunction, Dr. Lee will continue to work for Nevro and will continue to honor his non-disclosure agreement. As explained above, Nevro's technology is different than Boston Scientific's technology, and there is no danger of "inevitable disclosure." On the other side of the coin, granting this motion will give a non-disclosure agreement the effect of a non-compete, and prevent Dr. Lee from working in his chosen profession– a field in which he earned his PhD – potentially forever.

## V.    PUBLIC POLICY WEIGHS IN FAVOR OF DENYING THIS MOTION

There is sound public policy in favor of every person carrying on his trade or occupation freely. Woolley's Laundry v. Silva, 304 Mass 383, 387, 23 N.E.2d 899 (1939); Commonwealth v. CRINC, 392 Mass. 79, 87-88, 466 N.E.2d 792 (1984). Dr. Lee is not subject to a non-compete agreement; yet, Boston Scientific asks this Court to enforce restrictive covenants in such a way as to keep Dr. Lee from working with any other spinal cord simulation companies. Public policy weighs in favor of denying such a restraint on Dr. Lee's ability to carry on his occupation.

## VI.    CONCLUSION

For the foregoing reasons, Dr. Lee asks that the Court DENY the Motion for a Preliminary Injunction, and award him such other relief as the Court deems proper.

Respectfully submitted,

DONGCHUL LEE,

By his Attorney,

/s/  Christina Lewis
Christina L. Lewis, BBO #666715
HINCKLEY, ALLEN & SNYDER LLP
28 State Street
Boston, MA 02109
Phone: (617) 345-9000
clewis@haslaw.com

Dated:  January 9, 2014

21

## **CERTIFICATE OF SERVICE**

I certify that a true copy of this document filed through the ECF system will be sent electronically by the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 9 2014.

_____/s/  Christina Lewis_____
                Christina Lewis