UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION,<br><br>             Plaintiff,<br><br>vs.<br><br>DONGCHUL LEE,<br><br>             Defendant. | CIVIL ACTION NO.:1:13-cv-13156<br><br>**BOSTON SCIENTIFIC'S<br>SUPPLEMENTAL BRIEF<br>IN SUPPORT OF ITS MOTION<br>FOR PRELIMINARY INJUNCTION** |

## **INTRODUCTION**

Dr. Lee opposed Boston Scientific's motion on two primary grounds. First, he asserted that he is not performing the same research for Nevro that he performed for Boston Scientific. (Dkt. 20 ¶ 30.) Second, he asserted that Boston Scientific had not provided any evidence that he used or disclosed its Proprietary Information. (Dkt. 18 at 13.) The Court permitted expedited discovery to "determine the capacity and scope of Defendant's employment at Nevro." (Dkt. 37.) The evidence is now irrefutable: just as Boston Scientific asserted in its moving papers, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ while at Boston Scientific. This evidence comes directly from the thousands of proprietary and trade secret Boston Scientific documents Dr. Lee retained when he left Boston Scientific—and it establishes that Boston Scientific is likely to prevail on the merits of its claim that Dr. Lee cannot perform any work for Nevro related to ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ without disclosing Boston Scientific's Proprietary Information.

The evidence also establishes that Dr. Lee improperly used Boston Scientific's Proprietary Information while he was employed by Boston Scientific and after he left Boston Scientific. Dr. Lee retained volumes of Boston Scientific Proprietary Information when he

resigned. He produced more than 300,000 pages of Boston Scientific documents, many of which contain Boston Scientific's highly confidential trade secret information related to ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ (Dr. Lee discovered thousands of Boston Scientific documents stored on an external hard drive and a thumb drive *after* he told the Court that he only had such documents on his Google Drive. (Dkt. 20 ¶¶ 37-39).) Dr. Lee sent several of these trade secret documents to his personal Gmail account at key moments in his negotiations with Nevro regarding a possible job offer and retained them after he went to work for Nevro.

The preliminary computer forensic analysis performed by Boston Scientific raises additional red flags regarding Dr. Lee's handling of Boston Scientific's Proprietary Information after he resigned. <u>First</u>, Dr. Lee accessed his Gmail account and his Google Drive from his *Nevro* computer multiple times. Dr. Lee has admitted he forwarded several highly confidential trade secret documents to his Gmail account that address ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ emails that were in his possession while he worked for Nevro. <u>Second</u>, Dr. Lee accessed his Google Drive from his Nevro computer. <u>Third</u>, Dr. Lee used two thumb drives on his Boston Scientific computer—and these very same thumb drives were later plugged into his **Nevro** computer. <u>Fourth</u>, Dr. Lee had a folder called "Nevro" on his personal laptop that he deleted in late December 2013, after he had been served. This folder was deleted in a way that demonstrates that whoever was deleting it intended it to be rendered unrecoverable by a forensic analyst. <u>Fifth</u>, Dr. Lee retained volumes of Boston Scientific information on a *different* thumb drive that he has produced—and the "last accessed date" for many of the Boston Scientific documents on that drive is February 10, 2014—which suggests that either Dr. Lee or his counsel / forensic vendor improperly accessed the documents and overwrote the "last accessed" date. <u>Finally</u>, a network storage device called "HomeHard" was connected to Dr. Lee's Boston Scientific computer late at night before his last day at Boston Scientific. This storage device

appears to remain in Dr. Lee's possession, and was accessed—presumably—by Dr. Lee the day after he was served with the Complaint. Whether considered individually or cumulatively, these early forensic discoveries establish that Boston Scientific—and the Court—have reason to be gravely concerned regarding Dr. Lee's use of Boston Scientific's trade secret and proprietary information for his own and Nevro's benefit.

Boston Scientific respectfully asks the Court to enjoin Dr. Lee from performing any work for Nevro that is related to ████████████████████████████████████████.[1]

## ARGUMENT

**I. Boston Scientific is likely to succeed on the merits of its claim that Dr. Lee has breached his Agreement and trade secret laws.**

**A. Nevro hired Dr. Lee to research the ████████████████████ ████████████████ the same research he performed for Boston Scientific.**

**1. Dr. Lee studied ████████████████████ ████████████████ while employed by Boston Scientific.**

Boston Scientific sought a preliminary injunction against Dr. Lee because he performed highly sensitive research regarding ████████████████████████████████████ ████████████████████. As a result, Boston Scientific argued that Dr. Lee could not ████████████████ for Nevro without disclosing Boston Scientific's Proprietary Information. (*See* Dkt. 26 Ex. A ¶¶ 6-18.) Boston Scientific submitted sworn testimony in support of its motion for preliminary injunction that Dr. Lee:



---

[1] This language is somewhat broader than the language in Boston Scientific's original proposed order in that it would prohibit Dr. Lee from doing any work—not just research—in any way related to ████████████████ ████████████████ Boston Scientific believes this broader language is necessary because Dr. Lee's conduct establishes a pattern of blatant unwillingness to honor his post-employment obligations. Boston Scientific will promptly file a new proposed order reflecting this language and expects it will amend its complaint, and seek broader relief, once its analysis of the data it has received in the last few days is complete.



Dr. Lee testified, via two affidavits, that he did not perform such research for Boston Scientific. (*See* Dkt. 20 ¶¶11-12, 16, 22, 29-30; Dkt. 35 ¶ 8.) Dr. Lee told the Court that, when he worked for Boston Scientific, he worked ▮▮▮▮▮▮▮▮ "aimed at determining why low frequency clinical SCS therapy is effective." (Dkt. 18 at 4.) He stated that low frequency SCS systems "use paresthesia mapping to mask a patient's sense of pain" (Dkt. 20 ¶ 11) and suggested that he never performed any research for Boston Scientific regarding ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Dkt. 35 ¶ 8; Dkt. 20 ¶ 30.)

Dr. Lee's original testimony has now been directly contradicted by his deposition testimony and by confidential Boston Scientific documents he retained after he left Boston Scientific. For example, two of the documents Dr. Lee retained after he resigned from Boston Scientific address key parts of Boston Scientific's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The first example contains an email summary of Boston Scientific's ▮▮▮▮▮▮▮. (Second Declaration of Eileen Hunter ("2d Hunter Decl.") Ex. A.) Dr. Lee wrote this summary on June 20, 2013, in response to an "action item" list from one of his Boston Scientific colleagues regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4

███ Dr. Lee forwarded this email to his personal Gmail account on June 20, 2013, when he was engaged in discussions with Nevro regarding potential employment, and he retained it after he resigned from Boston Scientific.[2] (*See* Part I.A.2.a, *infra*.)

The second example is a document titled ███████████████████████ ███████████████████████████████████████████████████ (2d Hunter Decl. Exs. B, C.) Dr. Lee forwarded this document to his personal Gmail account on September 26, 2013, the day Nevro confirmed his interview date. Dr. Lee acknowledged this document was distributed to participating scientists under a confidentiality agreement in preparation for an in-person meeting in October 2013.[3] (D. Lee Dep. 224-25; 2d Hunter Decl. Ex. B; *see also* 2d Carbunaru Decl. ¶ 2.) This document stated the following objectives:



(2d Hunter Decl. Ex. C at 2 (emphasis added).) ███████████████████████ ███████████████████████████████████████████████████

---

[2] By emailing confidential Boston Scientific documents to his personal account, Dr. Lee violated Boston Scientific's Global Information Asset Protection Policy, which provides that "[p]ersonal or free e-mail accounts shall not be used at Boston Scientific for company business." (2d Carbunaru Decl. ¶ 4.)

[3] Boston Scientific learned at Dr. Lee's deposition that he had already received an offer from Nevro when he participated in ███████████████████████████████████████████████████

5

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ (D. Lee Dep. 221-22; *See* 2d Hunter Decl. Ex. E

at 2)—an admission that directly undercuts his claim that the trade secrets at issue in this case

"have long been in the public domain."[4] (Dkt. 18 at 1.) Dr. Lee also admitted that he participated

in the ██████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████. (D. Lee Dep. 209-21; *see also id.* 178-79.) Dr. Lee

summarized this research in a document used at the █████████████████████████

█████████████████████████████████████████████████ (2d

Hunter Decl. Ex. E; D. Lee Dep. 222.)

A third confidential Boston Scientific email from Dr. Lee to his colleagues at Boston

Scientific provides yet more evidence that he studied ████████████████████

███████████████████████████████████████████████████████

█████████████████████. (2d Hunter Decl. Ex. F.) Dr. Lee used the following subject line in

the email: "█████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ (*Id.*)

---

[4] Dr. Lee has also argued that because Boston Scientific reports certain data on the website www.clinicaltrials.gov, then any member of the public could determine that Boston Scientific is not researching a subject if it does not appear. (*See* D. 29-1 at 5.) But it is not required that all clinical research be posted on clinicaltrials.gov, and Boston Scientific does not do so. Therefore, the absence of information on clinicaltrials.gov would not necessarily inform an observer that Boston Scientific has failed to engage in certain research. (2d Carbunaru Decl. ¶ 5.)

Dr. Lee's statements that he did not study ▮▮▮▮▮▮▮▮▮▮▮ at Boston Scientific cannot be reconciled with the evidence Boston Scientific previously submitted or the evidence Dr. Lee has now produced.

### 2. Dr. Lee was hired to research the same MOA issues for Nevro that he researched for Boston Scientific.

Dr. Lee's conduct regarding how he came to be hired by Nevro—and for what purpose—strongly suggests that he purposefully sought employment with Nevro that would allow him to leverage what he learned at Boston Scientific about the ▮▮▮▮▮▮▮▮▮▮▮. First, he engaged in months of discussions with Nevro while employed by Boston Scientific and while actively involved in Boston Scientific's ▮▮▮▮▮; second, he emailed highly confidential Boston Scientific documents to his Gmail address regarding his ▮▮▮▮▮ research at key moments during those discussions; third, he raised concerns about the legal risks associated with Nevro hiring him; and fourth, his job description at Nevro covers the same ▮▮▮▮▮▮▮▮▮ research he performed for Boston Scientific.

Dr. Lee's conduct *after* he resigned and shifted his allegiance to Nevro further confirms that he intended to trade on his Boston Scientific ▮▮▮▮▮ for Nevro's benefit. In direct violation of his Agreement with Boston Scientific, Dr. Lee retained more than 300,000 pages of Boston Scientific documents, many of which contain highly sensitive information directly relevant to Nevro's efforts to understand the ▮▮▮▮▮▮▮▮▮. The results of the preliminary computer forensic investigation Boston Scientific has conducted are consistent with the evidence showing that Dr. Lee's employment with Nevro assumed that Nevro would benefit from his knowledge and possession of Boston Scientific's Proprietary Information.

7

### a. Dr. Lee and Nevro spent months negotiating his job offer.

Dr. Lee negotiated with Nevro for seven months—between March 2013 and October 2013—before he told Boston Scientific he was resigning. (*See* 2d Hunter Decl. Ex. G.) On March 15, Dr. Lee received an email from Nevro's Head of Global Clinical Research, Wesley Park, saying "Give me a call and let's try to meet up." (*Id.*) Dr. Lee replied to Park on June 13. (*Id.*) Seven days later, at 3 a.m., Dr. Lee emailed a highly confidential summary of his ▮▮▮▮▮▮▮ research for Boston Scientific from his Boston Scientific email account to his personal Gmail account. (2d Hunter Decl. Ex. A.) This summary is described in Section I.A above. (*Id.*) When Dr. Lee was asked why he sent the June 2013 summary to his personal Gmail account, he stated "I don't remember why I did."[5] (D. Lee Dep. 177:21.) Six days later, Dr. Lee emailed his curriculum vitae to Nevro's President/CEO, Michael DeMane, and indicated in the accompanying email that he had recently spoken with DeMane. (2d Hunter Decl. Ex. H.) Dr. Lee explained at his deposition that he "was thinking about leaving Boston Scientific" and that "maybe . . . was mentioning" this to Nevro. (D. Lee Dep. 37-38.)

During July and August 2013, Dr. Lee continued communicating with Nevro's senior leaders. Both Dr. Lee and Nevro expressed concern regarding the "risks" associated with Dr. Lee accepting a job with Nevro. After sending his CV to DeMane, Dr. Lee exchanged several emails with Park and Rami Elghandour, Nevro's Chief Business Officer. (2d Hunter Decl. Exs. I, J, K; *see also* Dkt. 19 ¶ 2.) On July 23, Dr. Lee wrote to Elghandour, "Hi Rami How are you doing? I hope Nevro is great. Can I say that officially now? :)". (2d Hunter Decl. Ex. I.) Elghandour replied, "Life is good. hope you are doing well. We are quite happy, that's all I can say ;)." (*Id.*) A week after he received this "wink" from Elghandour, Dr. Lee wrote to DeMane and asked "I

---

[5] This answer was one of the 36 times Dr. Lee testified that he did not remember key facts regarding his conduct while employed by Boston Scientific, while interviewing for Nevro, and while working for Nevro. (*See* D. Lee Dep. 22:7, 23:16, 39:22, 43:16, 45:12, 48:13, 49:1, 49:16, 73:24, 77:2, 80:21, 82:23, 88:13, 89:5, 91:3, 92:10, 99:13, 99:23, 100:19, 101:16, 104:21, 130:24, 157:16, 177:21, 181:6, 219:16, 221:7, 222:15, 224:4, 228:18, 229:16, 231:10, 233:12, 238:3, 238:24, 239:23.)

wonder if you had any chance to figure out the legal issue or risk for me to be full time employee." (2d Hunter Decl. Ex. J.) A few days later, Dr. Lee met in person with Elghandour who, DeMane assured Dr. Lee, would be "briefed on managing risk perceptions." (2d Hunter Decl. Exs. J, K.)

Despite the references to "legal issues" and "managing risk perceptions," Dr. Lee testified that he *may* have had *one* conversation with Park about areas of research that it would be inappropriate for him to participate in at Nevro, but stated he could not remember anything about that conversation. (D. Lee Dep. 88-91.) Dr. Lee testified that when he met with Elghandour they discussed "what's going on in the whole neuromodulation field. So in general. So – and that was it. And then the other part is what I was thinking about my future career." (D. Lee Dep. 82.) Dr. Lee later testified that he may have talked about the "three options" he (Dr. Lee) was considering for his next job, but that he and Elghandour did not discuss research he could not undertake or projects he should not be involved in if he went to work for Nevro. (D. Lee Dep. 88-89.) Dr. Lee expressly confirmed that he never told Nevro that there may be areas that he could not research for Nevro due to his previous work for Boston Scientific. (D. Lee Dep. 90-91.)

Dr. Lee emailed a second summary of his confidential ▇▇▇▇▇▇ for Boston Scientific to his personal Gmail account (2d Hunter Decl. Exs. B, C) on September 26, 2013, the day he received an email from Nevro confirming the date of his Nevro interview and six days before he participated in the interview. (2d Hunter Decl Exs. L, M.) This document was ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and is described in Part I.A above.

Dr. Lee was interviewed by the senior management at Nevro—including the President and the Chief Business Officer—for over five hours on October 2, 2013. (2d Hunter Decl. Ex.

9

M.) Dr. Lee testified that they asked him "in general" about his history of research at Boston Scientific, but he could not remember any specific questions Nevro asked. (D. Lee Dep. 96-97.) He said that the interview was "pretty much focused on my Ph.D." and "publications." (*Id.* 98.) Lee testified that Nevro *never* asked him whether he had done any ▆▆▆▆▆▆ research for Boston Scientific and *nobody* at Nevro expressed any concern regarding whether his work for Boston Scientific would overlap in some way with work he may be asked to do for Nevro (*id.* 98-99)—except for one possible conversation with Park, the particulars of which Dr. Lee no longer remembers (*id.* 88-91). Dr. Lee testified that he could not remember asking Nevro any questions regarding what he would be doing for Nevro. (*Id.* 99.) When asked "Was there ever a time that you sat down with them with your questions about what you were going to do and what the job would be like, that kind of thing?" Dr. Lee responded, "I don't remember any specific types of question, because as you can see in the job title, it's about theoretical research." (*Id.* 99-100.) Dr. Lee also testified that he could not remember discussing compensation or stock options with Nevro before receiving his offer. (*Id.* 99-100.) The next day, on October 3, 2013, Nevro offered him a job with an annual salary of ▆▆▆▆▆, plus ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (2d Hunter Decl. Ex. N.)

Despite the purportedly casual nature of the negotiations between Dr. Lee and Nevro, it turns out that Nevro hired Dr. Lee to conduct research and testing regarding the ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆—which is exactly what he was doing for Boston Scientific. Dr. Lee has now produced a job description, apparently created in January 2014, that contains 16 "Essential Duties and Responsibilities." (2d Hunter Decl. Ex. O.) The first five are:

10



(*Id*.) The three documents discussed in Part I.A above, and Boston Scientific's previous testimony submitted in support of this motion, establish that Dr. Lee researched these very areas for Boston Scientific—including research that focused on ▄▄▄▄▄▄▄▄▄▄ ▄▄▄▄ (*See* 2d Hunter Decl. Exs. A, B, C.) For example, the highly confidential Boston Scientific document that Dr. Lee emailed to his Gmail account two days before he interviewed with Nevro summarized ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (2d Hunter Decl. Ex. D at 2.) Similarly, Dr. Lee's summary of his hypotheses regarding ▄▄▄▄▄▄ ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ fall directly into the categories set out in his Nevro job description. (2d Hunter Decl. Ex. F.)

Dr. Lee's statements that he did not ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ ▄▄▄▄▄▄ at Boston Scientific do not hold water—nor do his assertions that he can perform any work related to ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ for Nevro without disclosing what he learned while at Boston Scientific.

> **b. Dr. Lee retained thousands of Boston Scientific documents when he went to work for Nevro.**

Dr. Lee resigned from Boston Scientific on October 18, 2013, and retained "thousands" of Boston Scientific documents, many of which contain Boston Scientific's Proprietary Information. (D. Lee Dep. 22.) These documents were stored in his Google Drive account, his

11

Gmail account, an external hard drive, and a thumb drive. (2d Hunter Decl. ¶ 5.) Dr. Lee testified at his deposition that he kept Boston Scientific's information because he was in a "hurry" when he resigned and did not have time to extract his "personal" documents. (D. Lee Dep. 23.) Yet, at no time after his last day on October 18 did he return any of Boston Scientific's documents—that is, until he was forced to by this Court's order granting Boston Scientific's motion for expedited discovery. Dr. Lee's decision to retain these documents directly violated his Agreement Concerning Employment ("Agreement") with Boston Scientific, which required him, upon ending his employment, to "immediately deliver to Boston Scientific . . . all documents and materials of any nature containing any Proprietary Information . . . without retaining any copies." *See* Dkt. 9-1 ¶ 3(d).

Dr. Lee has now produced over 300,000 pages of documents.[6] (2d Hunter Decl. ¶ 4.) Due to the volume, Boston Scientific has not been able to review every document—but even a cursory review establishes that this massive production includes highly confidential Boston Scientific documents that summarize the sensitive ████████████████████████████ Boston Scientific was seeking to protect when it filed its motion for preliminary injunction. (Second Hunter Decl. ¶ 5.)

      **c. The preliminary computer forensic investigation further indicates that Dr. Lee's employment with Nevro was premised on using Boston Scientific's Proprietary Information.**

Boston Scientific is in the process of examining the computers and storage devices Dr. Lee turned in on his last day at Boston Scientific. Dr. Lee has also produced various forensic evidence and reports related to his personal computer, external storage devices, and Nevro

---

[6] Dr. Lee produced over 78,000 pages of documents late in the day on February 11, 2014. (2d Hunter Decl. ¶ 4.) He then produced over 100,000 additional pages late in the day on February 12, just hours before his deposition took place on February 13. (*Id.*) Then, without notice, Dr. Lee produced another 100,000 pages late in the day on Friday, February 14. (*Id.*) This production contradicts Dr. Lee's testimony to this Court that the "only documents" he found when searching for Boston Scientific's documents in his possession were on his "Google Drive account." (Dkt. 20 ¶ 37.)

computer. (2d Hunter Decl. ¶ 6.) Many of the summary reports produced by Dr. Lee were incomplete and largely unusable. (Lanterman Decl. ¶ 5.) Boston Scientific's investigation of this evidence is ongoing, and requires additional information from Dr. Lee, Nevro, and Google.

Boston Scientific's preliminary investigation shows that Dr. Lee accessed his Gmail account and his Google Drive from his *Nevro* computer multiple times. (*Id.* ¶ 10.) Dr. Lee has admitted he forwarded several highly confidential trade secret documents to his Gmail account that address ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇—emails that were in his possession while he worked for Nevro. (*See* 2d Hunter Decl. Exs. A, B.) Boston Scientific's investigation of Dr. Lee's use of his Gmail account and Google drive is incomplete because (1) Dr. Lee did not produce a forensic image of his Nevro computer (despite Boston Scientific's request); (2) Boston Scientific does not have access to forensic images of Dr. Lee's Gmail account or Google drive; and (3) Boston Scientific does not have access to the underlying reports in Google's custody that show their usage histories. (Lanterman Decl. ¶ 10.)

The preliminary forensic evidence also shows that Dr. Lee used two thumb drives on his Boston Scientific computer—and these very same thumb drives were later plugged into his Nevro computer. (*Id.* ¶ 7.) Boston Scientific's investigation of how Dr. Lee used these thumb drives is incomplete because it does not have a forensic image of Dr. Lee's Nevro computer. (*Id.* ¶ 8.)

The preliminary forensic evidence also shows that Dr. Lee had a folder called "Nevro" on his personal laptop that he deleted in late December 2013 (*id* ¶ 12), after he had been served. This folder was deleted in a way that demonstrates whoever was deleting it intended it to be rendered unrecoverable by a forensic analyst. (*Id.*)

The preliminary forensic evidence also shows that Dr. Lee retained volumes of Boston Scientific information on a *different* thumb drive that he has produced—and the "last accessed

data" for many of the Boston Scientific documents on that drive is February 10, 2014. (*Id.* ¶ 11.) It is not known whether Dr. Lee accessed the documents on that date or whether his counsel or forensic vendor did so. If Dr. Lee accessed them, it demonstrates yet another misuse of Boston Scientific's Proprietary Information. And, if his counsel and / or vendor accessed them, they improperly destroyed evidence regarding the "last accessed" dates for those documents that cannot be recovered. Counsel and / or Dr. Lee' vendor should have made a forensic image of the thumb drive to preserve the "last accessed" dates as of the date it was surrendered by Dr. Lee. To determine what documents were accessed from this thumb drive—and when—Boston Scientific will need forensic images of each computer Dr. Lee plugged the thumb drive into.

<u>Finally</u>, a network storage device called "HomeHard" was connected to Dr. Lee's Boston Scientific computer late at night on October 17, 2013. (*Id.* ¶ 9.) Dr. Lee's last day at Boston Scientific was October 18, 2013. This storage device has not been produced to Boston Scientific's forensic vendor. (*Id.*) It appears to remain in Dr. Lee's possession because it was accessed by Dr. Lee on December 25, 2013 (*id.*), the day after he was served.

Whether considered individually or cumulatively, these early forensic discoveries establish that Boston Scientific—and the Court—have reason to be gravely concerned regarding Dr. Lee's use and disclosure of Boston Scientific's trade secret and proprietary information for his own and Nevro's benefit.

### B. Dr. Lee's use of Boston Scientific's Proprietary Information establishes Boston Scientific is likely to succeed on the merits of its breach of contract and trade secret claims.

Expedited discovery has revealed that Dr. Lee has used Boston Scientific's trade secret and proprietary information to obtain a job with Nevro doing the very research he performed for Boston Scientific. Dr. Lee retained thousands of Boston Scientific's proprietary and trade secret documents. He used those documents at key moments when he was negotiating a job with

Nevro. He discovered thousands of Boston Scientific documents stored on an external hard drive and a thumb drive *after* he told the Court that he only had such documents on his Google Drive. He accessed his Gmail account and Google Drive from his Nevro computer. He plugged in the very USB drives he used on his Boston Scientific computer into his Nevro computer. He accessed a remote storage device from his Boston Scientific computer the night before he resigned. He produced a thumb drive image that shows he accessed Boston Scientific documents on February 10, 2014. Dr. Lee breached his agreement not to disclose Boston Scientific information, and he took Boston Scientific's highly protected trade secrets by improper means. Dr. Lee should be enjoined. *See U.S. Elec. Servs. v. Schmidt*, 2012 U.S. Dist. LEXIS 84272, *23-24 (D. Mass., June 19, 2012) (discussing the Court's authority to enjoin a defendant "if the information which he gained through his employment and retained in his memory is confidential in nature" and the defendant has already disclosed that information). *See also* Dkt. 12 at 11-12 (summarizing irreparable harm standard); *id* at 7-10 (discussing elements of trade secret misappropriation).

## CONCLUSION

Boston Scientific respectfully asks the Court to enjoin Dr. Lee from performing any work for Nevro that is related to ███████████████████████████████████████ ████████████████████████████ for Nevro.

Dated: February 25, 2014          Respectfully Submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr.
One Boston Place Suite 3220
Boston, MA 02108
617-994-5728
patrick.curran@ogletreedeakins.com

15

Of counsel:
FAEGRE BAKER DANIELS LLP
Robert L. Schnell, Jr., # 97329
*robert.schnell@faegrebd.com*
Martin S. Chester # 031514X
*martin.chester@faegrebd.com*
Eileen M. Hunter, #0336336
*eileen.hunter@faegrebd.com*
2200 Wells Fargo Center, 90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000

*Attorneys for Plaintiff Boston Scientific Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel for Dongchul Lee through ECF filing on February 25, 2014.

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr.

dms.us.53653106.01