UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON SCIENTIFIC CORP., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DONGCHUL LEE, ) <br> ) <br> Defendant. ) | Civil Action No. 13-13156-DJC |

MEMORANDUM AND ORDER

CASPER, J.                                                                                                                    May 14, 2014

## I. Introduction

Plaintiff Boston Scientific Corp. ("Boston Scientific") has moved for a preliminary injunction: (1) enjoining Defendant Dongchul Lee ("Dr. Lee") from working for Nevro Corporation ("Nevro"); and (2) enjoining Dr. Lee from disclosing Boston Scientific's confidential, proprietary and/or trade secret information. D. 10. For the following reasons, the motion for a preliminary injunction is ALLOWED IN PART and DENIED IN PART.

## II. Standard of Review

To obtain a preliminary injunction, the party seeking the injunction must demonstrate: "1) a substantial likelihood of success on the merits; 2) a significant risk of irreparable harm if the injunction is withheld; 3) a favorable balance of hardships and 4) a fit, or lack of friction, between the injunction and the public interest." Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). A preliminary injunction is an "extraordinary remedy that may only be

1

awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)); see also Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (labeling a preliminary injunction as an "extraordinary and drastic remedy") (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)).

### III. Factual Background and Procedural History

Boston Scientific is a medical device manufacturer based in Natick, Massachusetts. D. 1 ¶¶ 2-3. Dr. Lee is a scientist who worked for Boston Scientific in its Valencia, California office from 2006 to 2013. Affidavit of Dongchul Lee, D. 20 ¶¶ 7, 15. Dr. Lee signed an employment agreement in which he promised not to disclose Boston Scientific's "Proprietary Information," which the employment agreement defines as "materials and information relating to [Boston Scientific's] operating procedures, products, methods, services techniques, designs, specifications, trade secrets, cost data, profits, markets and sales, customer lists, plans for present and future research, development and marketing." D. 9-1 ¶ 3.

While at Boston Scientific, Dr. Lee developed a computer model of the spinal cord, which was later published in a peer review journal. D. 20 ¶ 8. Dr. Lee used this computer model as part of his work relating to spinal cord stimulation ("SCS"). Id. SCS delivers electrical current to the spinal cord for the management of pain. Declaration of Rafael Carbunaru, D. 9 ¶ 3. Dr. Lee's SCS research was focused on "low frequency" SCS systems, which deliver electrical pulses to the spine below 1,200 Hz and often below 100 Hz. D. 20 ¶ 11. These pulses use paresthesia mapping to mask a patient's pain sensations. Id. In his final two years at Boston Scientific, Dr. Lee worked on Mechanism of Action ("MOA") research, which aims to determine why low frequency SCS is effective. Id.

2

While Dr. Lee worked at Boston Scientific, Nevro was independently researching the MOA of 10,000 Hz paresthesia-free SCS therapy to mask patients' pain sensations. Id. ¶ 12. In November 2013, Dr. Lee resigned his position at Boston Scientific to work at Nevro. Id. ¶¶ 15-16. According to Dr. Lee, Nevro has never asked Dr. Lee to disclose confidential or trade secret information to Boston Scientific. Id. ¶ 17. To the contrary, it required Dr. Lee to sign a contract which, *inter alia*, states that Dr. Lee "will not improperly use or disclose any confidential information, intellectual property or trade secrets, if any, of any former employer. . . ." Id. ¶ 18. After resigning from Boston Scientific, Dr. Lee returned some documents belonging to Boston Scientific to the company. Id. ¶ 36. However, some documents remained on his personal email and Google Drive account. Id. ¶ 40; D. 62-2. At Nevro, Dr. Lee is developing a model to explain how Nevro's paresthesia-free SCS therapy may be affecting the spinal cord, assisting with research relating specifically to Nevro's form of SCS therapy, assisting with the testing of optimal stimulation parameters specifically geared toward Nevro's SCS therapy and exploring new indications for Nevro's therapy. D. 20 ¶ 21.

Boston Scientific brought this action and moved for a preliminary injunction and expedited discovery, D. 1, 6, 10. After oral argument, the Court allowed the motion for expedited discovery and allowed additional briefing on the motion for a preliminary injunction. D. 31, 37, 54, 65.

In its reply memorandum and at oral argument, Boston Scientific posited a new theory of the case: that Dr. Lee had violated his confidentiality obligations by making certain statements in his affidavit, D. 20. For example, Boston Scientific alleged that "Dr. Lee makes several statements regarding research that Boston Scientific is not conducting, or about information he did not have when he was at Boston Scientific." D. 28 at 6 (citing D. 20 ¶¶ 12, 21(a), 22, 29). In

essence, Boston Scientific alleged that these attestations were "plans for present and future research" within the scope of Dr. Lee's employment agreement with Boston Scientific. D. 9-1 ¶ 3.

In his affidavit, Dr. Lee attested that:

- "Upon information and belief, Boston Scientific does not have a clinically tested 10 kHz SCS system." D. 20 ¶ 12.

- "The computational model I am building for Nevro is inherently different than the one I built for Boston Scientific because only Nevro has clinical experience with their proprietary, paresthesia-free HF10 SCS therapy . . . . The work I did on Boston Scientific's computer model is not useful to my work at Nevro because the anatomical variables, electrical inputs, and clinical observations used in creating the computer model are different." Id. ¶ 21(a).

- "Upon information and belief, Boston Scientific does not have an SCS system that can produce Nevro's (patented) paresthesia-free HF10 SCS therapy in a clinical setting. Further, upon information and belief, Boston Scientific does not have the clinical experience with HF10 SCS therapy necessary to perform the research I am now performing for Nevro. To the extent that Boston Scientific has such information, I was not privy to such information." Id. ¶ 22.

- "Upon information and belief, Boston Scientific does not have an SCS system that can produce Nevro's (patented) paresthesia-free HF10 SCS therapy in a clinical setting. Upon information and belief, Boston Scientific does not have the clinical experience with Nevro's HF10 SCS therapy. To the extent that Boston Scientific does have an SCS system . . . such system was not made available to me in conducting my MOA research." Id. ¶ 29.

As part of the limited expedited discovery allowed by the Court, Dr. Lee produced over 300,000 pages, including documents stamped "confidential" that provide details about Boston Scientific's plans for present and future research, research results and agenda for meetings regarding research. D. 62-2. In addition, Boston Scientific has presented additional evidence that it asserts supports its position that Dr. Lee has retained additional Boston Scientific materials since his departure from the company. D. 88.

4

**IV.    Discussion**

   **A.    Boston Scientific Has Shown a Likelihood of Success on the Merits**

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity."  New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

   *1.    Misappropriation of Trade Secrets*

Under Massachusetts law, to prevail on a misappropriation of trade secrets claim, Boston Scientific must demonstrate (1) the existence of a trade secret; (2) that Boston Scientific took reasonable steps to preserve the secrecy of the trade secret; and (3) that Dr. Lee used improper means, in breach of a confidential relationship, to acquire the trade secret.  Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1165 (1st Cir. 1994) (citing J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 729-31 (1970)).

   a)    At Least Some of the "Proprietary Information" Constitutes Trade Secrets

"The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret."  Healy, 357 Mass. at 736 (quoting Restatement; Torts § 757 comment (b)).  Whether or not a given set of business information is secret "depends on the conduct of the parties and the nature of the information," Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972), but there are six factors of relevant inquiry:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in

> developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Id.

During the course of the parties' expedited discovery, Dr. Lee has produced over 300,000 pages to Boston Scientific. D. 62-2 ¶ 4. These documents were stored on Dr. Lee's personal gmail account, his Google drive cloud-based storage account, an external hard drive and a USB "thumb" drive. Id. ¶ 5. These pages include confidential documents that provide details about Boston Scientific's plans for present and future research, results of the company's research and agenda for meetings regarding the company's research. See generally D. 62-2.

Upon review of the exhibits proffered, D. 62-2, it is apparent that these documents meet some if not all of the Jet Spray Cooler factors. As a general matter, other courts have found that information concerning plans for research or business methods and practices can constitute trade secrets. New England Overall Co. v. Woltmann, 343 Mass. 69, 77 (1961). The plans and results described in these documents were, according to Boston Scientific, distributed to only a select few individuals under a confidentiality agreement in preparation for an in-person meeting in October 2013. D. 62-2 at 135-36. In addition, Boston Scientific has taken some measure to keep these documents confidential by stamping them as such at or about the time of distribution. See, e.g., D. 62-2 at 13-17; cf. CVD, Inc. v. Raytheon Co., 769 F.2d 842, 853 (1st Cir. 1985) (considering that purported trade secret documents were not stamped confidential in determining that documents were not trade secret). Although there may be some question as to whether the information contained in these documents could be duplicated by others, this does not necessarily vitiate the essential nature of these documents, where "no general and invariable rule can be laid down" as to the existence of a trade secret. Jet Spray Cooler, 361 Mass. at 840; see

Restatement 2d of Torts § 757 Cmt. b (noting that the six factors are "[s]ome factors to be considered" and not necessary elements of trade secrets).

> b) Boston Scientific Used Reasonable Means to Protect Its Trade Secrets

Moreover, Boston Scientific has taken reasonable steps to protect its trade secrets. It is not necessary "that an 'impenetrable fortress' be erected to retain legal protection for a trade secret." Picker Int'l Corp. v. Imaging Equip. Servs., Inc., 931 F. Supp. 18, 23 (D. Mass. 1995) (citations omitted), aff'd sub nom., Picker Int'l Inc. v. Leavitt, 94 F.3d 640 (1st Cir. 1996). Instead, courts consider four relevant factors in determining whether plaintiffs asserting trade secret protections took reasonable security precautions:

> (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties, (3) the circumstances under which the information was disclosed . . . to (any) employee to the extent that they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered "readily ascertainable" by the third parties.

USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 98 (1979) (quoting Kubik, Inc. v. Hull, 224 N.W.2d 80, 91 (Mich. App. 1974)). Ordinarily, however, confidentiality agreements suffice to constitute reasonable protective measures. Harvard Apparatus, Inc. v. Cowen, 130 F. Supp. 2d 161, 176 (D. Mass. 2001); People's Choice Mortgage, Inc. v. Premium Capital Funding, LLC, 06-3958-BLS2, 2010 WL 1267373, at *15 (Mass. Super. Mar. 31, 2010).

Here, the documents discussed above were distributed to only a select few individuals under a confidentiality agreement in preparation for an in-person meeting in October 2013. D. 62-2 at 135-36. Accordingly, Boston Scientific had a reasonable expectation that these documents would remain confidential and the recipients of these documents were on notice that

7

further disclosure was prohibited. E. Marble Products Corp. v. Roman Marble, Inc., 372 Mass. 835, 840 (1977) (noting that confidentiality agreement "put the employees on notice that secrets were involved"). On the other hand, Dr. Lee argues that his transmission of confidential files to his personal email and Google drive was a self-inflicted wound to Boston Scientific since the company refused Dr. Lee's request for a smart phone that would have allowed him to access his company email remotely. D. 72 at 10. Indeed, there is some question as to whether the company was on notice of this practice, particularly where Dr. Lee asserts that he shared documents with his colleagues using Google Drive. D. 72-3 ¶ 6. Absent any confirmation of same, however, the Court concludes that Boston Scientific used reasonable means to protect its trade secrets.

        c)      Improper Means Is Evidenced by Retention of Documents in Violation of the Parties' Agreements

Boston Scientific's expedited discovery has demonstrated that Dr. Lee has retained many pages of documents belonging to Boston Scientific in his personal email account, Google Drive account, external hard drive and "thumb" drives. D. 62-2 ¶¶ 3-4. Dr. Lee has testified that the retention of this swath of documents belonging to Boston Scientific was inadvertent. D. 62-2 at 88-89. Nevertheless, his employment agreement required him upon termination of his employment to "immediately deliver to Boston Scientific . . . all documents and materials of any nature containing Proprietary Information . . . without retaining any copies." D. 9-1 ¶ 3(d). "As a matter of law, an individual who breaches contractual duties to obtain trade secrets has used improper means." Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 240 (D. Mass. 2011) (citing Data Gen. Corp., 36 F.3d at 1165). Accordingly, Boston Scientific has demonstrated that Dr. Lee used improper means to obtain trade secrets.

    2.    *Breach of Employment Agreement*

Boston Scientific has also asserted that it is likely to succeed on its breach of contract claim. To succeed on this claim, Boston Scientific must demonstrate that the parties reached a valid and binding agreement, Dr. Lee breached the terms of the agreement and Boston Scientific suffered damages as a result of the breach. Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999). Dr. Lee does not necessarily dispute the employment agreement's validity, but instead disputes whether he has breached the terms of that agreement, particularly the non-disclosure portions of his employment agreement. D. 72 at 11. The Court, however, need not resolve that matter because, for the reasons discussed above, Boston Scientific has demonstrated a reasonable likelihood of proving that Dr. Lee breached the portion of his employment agreement that prohibits him from retaining Boston Scientific's Proprietary Information after leaving the company. D. 9-1 ¶ 3(d).

Dr. Lee insists that his retention of these documents was inadvertent. D. 72 at 12. Although this may play a role in the Court's equitable analysis, scienter is not, itself, an element of breach of contract. See In re Chew, No. 05-21076 RS, 2007 WL 1876457, at *3 (Bankr. D. Mass. June 27, 2007). Dr. Lee's asserted lack of intent does not change the Court's analysis.

**B.     Boston Scientific Faces Irreparable Harm Absent the Relief the Court Will Grant**

Although plaintiffs must demonstrate the likelihood of irreparable harm to obtain injunctive relief, Matos v. Clinton Sch. Dist., 367 F.3d 68, 73 (1st Cir. 2004), "[w]hen a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed." EchoMail, Inc. v. Am. Express Co., 378 F. Supp. 2d 1, 4 (D. Mass. 2005). "That is in recognition of the fact that, 'once the trade secret is lost, it is gone forever.'" TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23,

32 (D. Mass. 2004) (quoting FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984)).

Even if irreparable harm were not presumed as a matter of law, the Court would find a likelihood of irreparable harm here, absent a court order at least as to the return and nondisclosure of the Proprietary Information. Without a court order to the contrary, Dr. Lee can disclose Boston Scientific's trade secrets at any time. The use and disclosure of Boston Scientific's confidential information is, in itself, an irreparable harm. See Aspect Software, Inc. v. Barnett, 787 F. Supp. 2d 118, 130 (D. Mass. 2011).

That having been said, the Court notes with great care exactly what type of irreparable harm the preliminary injunction here might aim to prevent. Although Boston Scientific has asked the Court to enjoin Dr. Lee's employment at Nevro, the real harm that Boston Scientific faces absent injunctive relief is not bargained-for competition, see D. 9-1 (employment agreement does not include a post-employment restrictive covenant), but rather the disclosure of information that could provide Nevro with an unfair competitive advantage. As a result, and as discussed further below, *infra* § IV-E, the Court concludes that there is the real risk of irreparable harm absent a return of the Proprietary Information and an order barring any disclosure of same.

### C. The Balance of Harms Tips in Boston Scientific's Favor, but Only as to the Return of the Trade Secrets and Nondisclosure of Same

For the reasons discussed above, Boston Scientific faces significant harm absent return of the Proprietary Information and nondisclosure of same. The Court can discern no harm to Dr. Lee from a court-ordered return of all Boston Scientific materials that he has retained and from the nondisclosure of that information. Such an injunction would not prevent Dr. Lee from working in the SCS field, in California or even at Nevro. On the other hand, a court order imposing a restrictive covenant (where none exists) into Dr. Lee's employment agreement,

10

prohibiting him from working at Nevro, would unfairly deprive Dr. Lee of his livelihood. Moreover, it would be inherently inequitable to impose a restrictive covenant to which Dr. Lee never agreed and after he has already accepted a position at a competing company. The Court is particularly disinclined to impose a restrictive covenant on Dr. Lee where even the grant of a preliminary injunction itself is an "extraordinary and drastic remedy." Voice of the Arab World, 645 F.3d at 32. Accordingly, to the extent Boston Scientific seeks injunctive relief barring Dr. Lee from competing with Boston Scientific, the Court declines to grant that relief.

### D. The Public Interest Favors Certain Injunctive Relief

A preliminary injunction is not appropriate unless there is "a fit (or lack of friction) between the injunction and the public interest." Nieves-Márquez, 353 F.3d at 120. Massachusetts clearly favors strong protections for trade secrets. Jet Spray Cooler, 377 Mass. at 166 n.8. Accordingly, the Court concludes that injunctive relief, to the extent that Boston Scientific seeks a return of its trade secrets, is consonant with the public interest. On the other hand, a restrictive covenant is only consonant with the public interest if it is reasonable in scope and time and supported by adequate consideration. Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 102 (1979). Here, the parties have not executed a restrictive covenant and Boston Scientific does not propose any temporal limitations to any order enjoining Dr. Lee from working at Nevro. Consequently, to the extent Boston Scientific seeks injunctive relief barring Dr. Lee from working at Nevro, the Court cannot determine on this record that such relief would be consonant with the public interest.

### E. The Court Will Issue a Preliminary Injunction Order That Is Limited in Scope

In light of the foregoing, the Court must craft an appropriate preliminary injunction. The nature of preliminary injunctive relief must flow from the claims upon which the plaintiff is

11

likely to succeed. Omega World Travel, Inc. v. Trans World Airlines, 111 F.3d 14, 16 (4th Cir. 1997) (noting that "a preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action"); Lebron v. Armstrong, 289 F. Supp. 2d 56, 61 (D. Conn. 2003) (noting that "to prevail on a motion for preliminary injunctive relief, the moving party must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint") (citing Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994)). Boston Scientific has asked the Court to enjoin Dr. Lee from "(1) working for Nevro Corporation in any capacity related to (a) researching the mechanism of action for spinal cord stimulation systems or (b) designing or conducting feasibility studies regarding such research; and (2) otherwise using or disclosing Boston Scientific's confidential, proprietary, or trade secret information." D. 10.

The Court concludes that Boston Scientific is entitled to have any documents containing confidential, proprietary or trade secret information returned to it, as Boston Scientific has demonstrated a likelihood of success on its claim that Dr. Lee, at a minimum, breached the aspects of his employment agreement regarding retention of Proprietary Information and its claim that Dr. Lee misappropriated trade secrets belonging to Boston Scientific and nondisclosure of same.

Where plaintiffs have brought claims for misappropriation of trade secrets under Massachusetts law, they have consistently succeeded in achieving the immediate return of protected information, but absent a restrictive covenant, have not necessarily succeeded in enjoining their former employees' employment in their new roles. Network Sys. Architects Corp. v. Dimitruk, No. 06-4717-BLS2, 2007 WL 4442349, at *3 (Mass. Super. Dec. 6, 2007) (quoting preliminary injunction order where motion judge found that "the plaintiff is not entitled

12

to obtain a covenant not to compete in the absence of any agreement not to do so"); Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass. App. Ct. 937, 938 (1984) (affirming trial court's injunction against use of plaintiff's trade secret but not enjoining former employee from competition); see also Aggreko, LLC v. Koronis, No. 13-13034-TSH, 2013 WL 6835165, at *6 (D. Mass. Dec. 19, 2013) (concluding that plaintiff had demonstrated a likelihood of success on its claim for breach of non-disclosure agreement, but determining that "the public interest does not favor restraining lawful competition where steps are taken to ensure such competition is lawful"); Picker Int'l Corp., 931 F. Supp. at 45 (enjoining use of trade secrets only). Also instructive is another case, Corp. Techs., Inc. v. Harnett, 943 F. Supp. 2d 233 (D. Mass. 2013), in which the defendant had executed non-disclosure and non-solicitation agreements, but not a non-competition agreement, and the court enjoined the defendant from divulging confidential information or soliciting his former employer's clients. Id. at 248. In addition, the court noted that it would have granted the defendant's reciprocal motion for preliminary relief enjoining the plaintiff from characterizing the defendant's agreements with the plaintiff as a "non-compete" had defendant demonstrated the likelihood of future irreparable harm. Id. at 247-248.

Boston Scientific cites Marcam Corp. v. Orchard, 885 F. Supp. 294, 297 (D. Mass. 1995); Aspect, 885 F. Supp. at 297; Lombard Med. Tech., Inc. v. Johannessen, 729 F. Supp. 2d 432, 442 (D. Mass. 2010); Corp. Techs., 943 F. Supp. 2d at 248; and C.R. Bard, Inc. v. Intoccia, No. 94-11568-Z, 1994 WL 601944, at *3 (D. Mass. Oct. 13, 1994) for the notion that an employee, now employing at a new company in the same field, will inevitably disclose confidential information absent an injunction. D. 12 at 11-12. In these cases, however, the court did not enjoin the defendant from competing with the plaintiff where the defendant had not executed a covenant not to compete. Marcam, 885 F. Supp. at 299-300 (enforcing non-competition

13

agreement); Aspect, 787 F. Supp. 2d at 131 (same), Lombard, 729 F. Supp. 2d at 440 (same); Corp. Techs., 943 F. Supp. 2d at 248 (enforcing non-solicitation and non-disclosure agreements); C.R. Bard, 1994 WL 601944 at *4 (enforcing non-competition agreement).

Even if Boston Scientific had provided further support for the contention that courts can, effectively, transform non-disclosure agreements into non-competition agreements, the Court cannot say on this record that Dr. Lee's work at Nevro will necessarily lead to the disclosure of any Proprietary Information. First, Dr. Lee's non-disclosure of the Proprietary Information is a term of his employment at Nevro. D. 20 ¶ 18. In addition, Dr. Lee is not developing products for Nevro, but rather researching the underlying science. D. 20 ¶ 21. Although it is true that Nevro may develop a product that competes with a Boston Scientific product, Dr. Lee's testing the efficacy of SCS, either high or low frequency, does not necessarily bear upon the future research plans of Boston Scientific or the development of their products. D. 72-3 ¶ 39.

Finally, the Court addresses Boston Scientific's argument that Dr. Lee disclosed Proprietary Information during the course of this litigation. D. 28 at 6. The Court notes that there is some inherent unfairness in using Dr. Lee's statements against him here, where he trying to defend himself against the instant allegations brought by Boston Scientific, his former employer. In any event, the parties have addressed any possibility of future harm in this regard by filing their subsequent submissions under seal. Cf. Imaging Techs., Inc. v. Marchant, 584 F. Supp. 2d 322, 330 (D. Mass. 2008) (noting that to show irreparable harm, a movant must demonstrate "an actual, viable presently existing threat of serious harm").

## V. Conclusion

For these reasons, the Court declines to adopt Boston Scientific's proposed preliminary injunction order, D. 10-1, *in toto*. The Court ALLOWS the motion, D. 10, only to the extent that

Dr. Lee shall be 1) enjoined from using or disclosing Boston Scientific's "Proprietary Information" and 2) shall be ordered to (a) return the Proprietary Information to Boston Scientific; and (b) certify his compliance with the preliminary injunction order under oath within two weeks of the effective date of said order. The Court DENIES the motion to the extent it seeks to restrain Dr. Lee from working at Nevro.[1]

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[1] The Court notes that the parties have filed a number of supplemental briefs and affidavits since the initial two rounds of briefing concluded on March 5, 2014. The Court has considered each of these filings in deciding this motion and ALLOWS the pending motions for leave to file additional briefs and declarations, D. 30, 44, 88, and motions to seal, D. 25, 27, 52, 79, 94, *nunc pro tunc*. The Court DENIES Boston Scientific's second motion for expedited discovery as moot. D. 75.